Boyce Leon MOSCO and Fred John Hansen, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17130.

United States Court of Appeals Ninth Circuit.

April 2, 1962.

Rehearing Denied May 18, 1962.

Russell E. Parsons and Harry E. Weiss, Los Angeles, Cal., for appellant Boyce Leon Mosco.

Morris Lavine, Los Angeles, Cal., for appellant John Hansen.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Division; and Richard A. Murphy, Los Angeles, Cal., for appellee.

Before STEPHENS, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

Two separate appeals were consolidated for hearing before us. Boyce Leon Mosco and Fred John Hansen were jointly indicted under 18 U.S.C. § 2113(a)(d), charged with armed bank robbery. The specific charge was that by force, violence and intimidation upon certain individuals,[1] through the use of hand guns, they took $11,297.09 belonging to and in the care, control and possession of ILWH Local 13, Federal Credit Union, "a Federal credit union, as defined in 18 U.S.C. § 2113(g)."[2]

Jurisdiction was conferred upon the district court by § 2113, Title 18 United States Code. This court has jurisdiction by virtue of 28 U.S.C. § 1291.

### I—FACTS

Because the insufficiency of the evidence is urged as one ground of appeal, it becomes necessary to consider the evidence.

■ The jury, by its verdict, resolved all factual doubts in favor of the government. And this court must view the evidence in the light most favorable to support the judgment.[3] Therefore we adopt the statement of facts set forth by appellee in its brief, which appellants do not dispute.

---

1. Four named employees and one officer of the Credit Union, and a Federal Credit Union Examiner.

2. "§ 2113. **Bank robbery and incidental crimes**

   *    *    *    *    *

   "(g) A used in this section the term 'savings and loan association' means any Federal savings and loan association and any 'insured institution' as defined in section 401 of the National Housing Act, as amended, and any 'Federal credit union' as defined in section 2 of the Federal Credit Union Act. As amended Apr. 8, 1952, c. 164, 66 Stat. 46; Sept. 22, 1959, Pub.L. 86–354, § 2, 73 Stat. 639."

3. Glasser v. United States, 1942, 315 U.S. 60, 62, 62 S.Ct. 457, 86 L.Ed. 680; Teasley v. United States, 9 Cir. 1961, 292 F.2d 460; Alverez v. United States, 9 Cir. 1960, 282 F.2d 435.

Shortly after 4:00 P.M. on January 21, 1960, a Federal Credit Union (Longshoremen's Local No. 13) at Wilmington, California, was robbed by two gunmen wearing stocking masks. "Approximately" $11,297.09 was taken.

A few minutes before the robbery, a witness (a photographer who occupied the office across the hall from the Federal Credit Union), left the building. As he walked down the front steps, he saw appellant Hansen standing to his left "fiddling" with his shoe. The witness nodded but Hansen did not respond. As he passed Hansen, the witness noted that there was something wrong with the eyes of the man he identified as Hansen; it appeared that one eye did not match the other.

Minutes later, two gunmen wearing stocking masks entered the Credit Union. Three female tellers were standing near the cashier windows. One Robertson, a Federal Credit Union Examiner; and Osornio, the Credit Union Treasurer; and Ruth Johnson, the Credit Union Manager, were in the back part of the office, where Robertson, was talking on the telephone. Teller McCluskey was startled as she turned from her conversation with Teller Hennessy by a gun which was placed against her stomach by one of the robbers. The robber stated to Mrs. McCluskey, "I mean it, lady. Get in the wault [sic, vault]." The gunman had something wrong with his eyes and spoke with a Scandinavian accent.

Tellers Hennessy, Curtis and McCluskey were herded into the vault. Mrs. Johnson, Mr. Osornio and Mr. Robertson were then ushered at gunpoint into the vault with the others. The gunmen forced their prisoners to get on their knees and face the rear of the vault. One of the gunmen said: "Keep your head down, I mean it. Keep your head down. I don't want to kill anyone." Mrs. Hennessy was forced to empty the contents of the cash boxes into a paper bag handed to her by one of the gunmen.

One teller pleaded not to be locked in the vault as she and the two other ladies had children. The plea was unheeded and the vault was locked, imprisoning the six persons in the airtight confines of the vault. One of the men found a coin on the floor of the vault which he used to remove some of the screws from the locking mechanism, thereby enabling the victims to escape before they were suffocated. Mrs. McCluskey, Mrs. Hennessy and Mrs. Johnson identified Mosco as one of the robbers. It was noted that Mosco had a clumsy stride and a bounce to his walk. Hansen's identification as one of the robbers was made by Robertson, Osornio, Mrs. Curtis, Mrs. McCluskey, and Mrs. Hennessy. Hansen is a native of Denmark. He is blind in one eye, having no muscular control over that eye.

About one hour after the robbery, Hans Andersen, an old friend and countryman of Hansen, saw Mosco and Hansen with a large sum of money spread out on Mosco's bed in his apartment located at 5437 Virginia Avenue, just off the Hollywood Freeway. As Hansen and Andersen were about to leave, Mosco cautioned Andersen that since he was the only one that knew about "it" (the money), anything that came out of "it" had to come from Andersen.

A few weeks prior to the robbery, one Paul Lomeli, a longshoreman, early one morning saw two men walking around the outside of the Credit Union office. The men peeked through the window into the Credit Union. One of the men had a "droopy" eye. Lomeli identified Hansen as this man. The other man had a protruding chin and looked like Mosco. Because of what he had seen Lomeli noted the license number of the car in which they were riding, and wrote the number on a "check stub." (Exhibit 5 in evidence.) The license number was SXV788.

Hans Andersen was the owner of a Ford automobile bearing license number SXV788. Andersen lived in Pasadena and repossessed automobiles for a living. Andersen allowed his old friend Hansen to live with him, since Hansen was unemployed and without funds. Andersen had known Hansen in Denmark before each had come to the United States; and he allowed Hansen to drive his Ford au-

tomobile (license number SXV788) as often as he wished. On the morning of January 21, 1960, Mosco visited Hansen at the Andersen's residence.

On the evening of January 21, 1960, when Andersen and Hansen had returned from Mosco's apartment where the money had been seen on the bed, Hansen gave Andersen $20 and Andersen's wife $60. A little later that same evening the Andersen residence was visited by FBI representatives, who questioned both Andersen and Hansen as to their whereabouts at 4:00 P.M. on that afternoon. At first Andersen told the agents that he had been working and that he was alone. Later, after a conversation with Hansen in Danish, Andersen changed his story and told the agents that he and Hansen had been together at 4:00 P.M. on January 21, 1960. Soon after the agents left Hansen also left, driving Andersen's Ford, and took a suitcase with him.

Hansen went to the apartment of one Leisten, another friend and fellow Dane. When Leisten returned from work at about midnight on January 21, 1960, he found Hansen waiting in his apartment. Hansen stayed with Leisten that night. The following day they went to Hansen's room at the Salem Manor Hotel, where they were joined by two girls and a man. Hansen gambled with some of the others and lost about $300 in cash and about $2,000 in I.O.U.s. The following morning they returned to Leisten's apartment.

A day or so after the robbery Andersen was visited by a stranger, Mr. Kimo. Andersen followed Mr. Kimo to a bar where he met Hansen. Hansen then requested Andersen not to change his story which he had given to the FBI agents on the night of the robbery. Hansen was then driven to the airport by Leisten. Hansen appeared to be nervous. While at the airport, Hansen showed Leisten a large sum of money and gave him an envelope containing five $100 bills. Hansen told Leisten that he was going to Chicago, but when he checked his suitcase, his ticket indicated that it had been sold for transportation to Denver. Hansen used the name Mr. Sanders at the airport.

On January 28, 1960, FBI Agent Plevack found Andersen's Ford, which Hansen had been driving on the night of the robbery, parked in a lot behind a service station in the 9300 block on Sunset Boulevard. Andersen, its owner, had given the officers permission to search the car when it was found. Agent Plevack searched the car and discovered a stocking mask which was of the same color as that worn by the gunmen in the robbery. The mask had been concealed above the wiring behind the dashboard.

Special Agent Haymes of the FBI arrested Hansen at a bar in Pasadena at 9:15 P.M. on January 28, 1960. At the time of his arrest, Hansen was in the company of Ruth Martinez. After the arrest, the officers searched a traveling case belonging to Ruth Martinez (after obtaining from Ruth Martinez a written consent to such search), and found the case contained two sacks, and $2,005 in bills within the sacks, which were concealed behind the mirror. Hansen's thumbprint was found on the paper sacks, and he admitted to the officers that the money was his, and that Ruth Martinez had knowledge of its presence.

Paul Lomeli had told the officers that one of the men that he had observed at the Credit Union several weeks before had a protruding chin. As noted above Lomeli had identified Hansen as the other man. By following Hansen's steps prior to the time he left the city, the officers were able to determine that an outgoing call from Hansen's room at the Salem Manor Hotel was made to apartment 306, 5437 Virginia Avenue, Hollywood, California. The person under whose name the telephone was listed was a Dr. Mask. On January 27, 1960, Agent Plevack and Detective Sage of the Los Angeles Police Department went to this address. Mosco, after the policemen identified themselves, *invited* them into the apartment; he told the officers that he had lived there for a couple of months; he owned a car which was parked out front; that he did not know a Dr. Mask nor a Fred Hansen. Mosco *consented* to the officers looking around the apartment and the officers

noted Mosco's telephone number. The officers also noted that Mosco had a protruding chin.

After a brief conversation with Mosco, Agent Plevack and Detective Sage left, and rejoined other officers at the Salem Manor Hotel. Lieutenant Weyant of the Los Angeles Police Department and Agents Crowe and Haymes of the FBI informed Plevack and Sage of the results of their own investigations. Sage and Plevack learned that a confidential source had revealed that a man named Boyce (Mosco's first name), who lived near the Hollywood Freeway on Virginia Avenue, and who had "a great big chin," was the second man in the Federal Credit Union robbery.

Instantly, Sage and Plevack realized that Mosco fitted the description.[4] All officers immediately went to Mosco's apartment for the purpose of arresting him for the robbery under investigation. When Sage and Plevack arrived at Mosco's apartment they noticed that his car was no longer parked where they had seen it on their earlier visit. When there was no response to their knock on Mosco's door, the officers gained admittance to the apartment through the aid of the landlord. The officers looked through the apartment and verified the fact that Mosco was not there. A telephone request was then made for the immediate apprehension of Mosco by other units. The officers then sought to determine where Mosco had gone.

A half hour later Mosco returned to his apartment and was immediately arrested. According to Mosco, when he entered the apartment the officers had their guns drawn and had been searching the apartment. Special Agent Plevack's F. B.I. report (Defendant's Exhibit E for Identification, read into the record by counsel for Mosco) stated that the apartment was searched and items seized *after* the arrest had been made. Both Plevack and Sage testified, however, that Exhibit

C was found in a wastebasket in Mosco's kitchen on the first search. It was identified at the trial by Mrs. Fix, a teller at the Credit Union, as the same adding machine tape which she had prepared and which had been in her cash box at the time of the robbery. Also seized by the officers was a tablet of writing paper (Ex. B) which was located next to the telephone, and upon which was noted various names and telephone numbers, including the name "Fred" opposite the telephone number of Fred Hansen.

Detective Sage and Lieutenant Weyant had Mosco in custody as they left the apartment following the arrest and search. As they passed Mosco's car, the officers asked Mosco for his permission to search the vehicle. Mosco *consented* (though he disclaimed consent at his trial).[5] The officers found a "Rediform" sales book "in the rear seat area down between the seat cushion and the back cushion of the rear seat, out of sight." The printed order forms were blank except for three slips, Numbers 9206, 9249 and 9236. The later page in the notebook (Ex. A-1) contained on its reverse side handwritten directions explaining how to get to the Credit Union in Wilmington. Mosco had denied, earlier, that he had even been to Wilmington.

But this was not the first search of Mosco's auto. Prior to this second visit to the car, officer Sage had located the car and searched it at its location on a parking lot of an apartment house directly across the street from the apartment house in which Mosco resided. Exhibit A, the note book, was found on this first search between the two cushions of the rear seat. "I had removed the rear seat and it was down between the two * *." Sage replaced the exhibit, then the seat cushion and returned to Mosco's apartment.

Agent Crowe had, on several occasions, observed the movements of Mosco. Crowe attended a line-up at the police

---

4. It would be difficult not to recognize Mosco from such a description. Cf.: Government Ex. 12, Sheriff's photograph of Mosco.

5. On the hearing of the motion to suppress (R. 50).

station prior to the trial and observed that Mosco, who was in the line-up, walked differently, ran differently and held his chin in an unusual fashion during the line-up.

Prior to the trial Mosco saw Andersen in the Federal Courthouse in Los Angeles, and, while patting Andersen on the shoulder, said: "You don't want to put your friend up."

## II—SPECIFICATIONS OF ERROR

Appellants Mosco and Hansen jointly and separately assert:

(1) The trial court lacked jurisdiction.

(2) That they were aggrieved by illegal searches and seizures.

(3) The evidence was insufficient to support the conviction.

Appellant Mosco separately asserts, in addition:

(4) The identity of the government's confidential source of information should have been disclosed.

(5) The government attorney was guilty of misconduct.

Appellant Hansen, in addition to the common contentions, asserts:

(6) The court erred in admitting certain evidence.

(7) The court erred in its ruling on the motions (for acquittal and to suppress).

(8) The court coerced the jury.

(9) The court erred in instructions given.

(10) The court imposed an illegal sentence.

Both appellants made motions for acquittal at the close of their defense and at the close of all evidence. The motions were denied.

■ 1. We first consider the jurisdiction of the district court. Appellants contend that § 2113 of Title 18 U.S.C. is "an interference with the exercise of police powers of the individual states in violation of the Tenth Amendment to the Constitution of the United States."

As appellee points out, this exact same point was raised in Clark v. United States, 10 Cir. 1950, 184 F.2d 952, cert. denied 340 U.S. 955, 71 S.Ct. 566, 95 L. Ed. 688. There the Court said:

"[I]t is urged that 588c [now § 2113] is an unwarranted usurpation of authority by Congress and an interference with the exercise of the police powers of the individual states in violation of the Tenth Amendment to the Constitution. We find no merit in this contention. * * *" (Id. at 953, 340 U.S. at 955, 71 S.Ct. 566, 95 L.Ed. 688.)

And Mr. Justice Holmes disposed of a similar point in Westfall v. United States, 1927, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036, where he said:

"Of course an act may be criminal under the laws of both jurisdictions. [Citation.] And if a state bank chooses to come into the System created by the United States, the United States may punish acts injurious to the System, although done to a corporation that the State also is entitled to protect. The general proposition is too plain to need more than statement. * * *" (Id. at 258, 47 S.Ct. 629, 71 L.Ed. 1036.)

Clearly this point is without merit. The statute is constitutional and the district court had jurisdiction.

To the 1934 enactment of § 2113 of Title 18, referring to bank robbery, there was in 1950 added by the Congress subsection (g) to bring within its provisions state-chartered savings and loan associations whose accounts are insured by the Federal Savings and Loan Insurance Corporation. Again in 1959, subsection (g) was amended to include "any Federal credit union," as defined in Section 2 of the Federal Credit Union Act. (Pub. Law 86–354.) Section 2 defines a Federal credit union as "a cooperative association organized in accordance with the provisions * * * [of Chapter 14 of Title 12] for the purpose of promoting thrift among its members and creating a source of credit for provident or productive purposes." 12 U.S.C.A. § 1752. Such Federal credit unions are under the

supervision of the Director of the Bureau of Federal Credit Unions, a bureau established within the Federal Security Agency. Each Federal credit union is subject to examination by the Director, or any person he designates (Sec. 1756, Federal Credit Union Act); and the Director may suspend or revoke any charter of any Federal credit union, or place the same in involuntary liquidation upon a finding the union has violated its charter, its by-laws, the Federal Credit Union Act, or any regulation issued thereunder by the Director (Sec. 1766.) The Federal credit unions are exempt from taxation, both Federal and local (Sec. 1768).

Thus the Federal credit unions are chartered, examined, supervised and rendered tax exempt by the Bureau of Federal Credit Unions, but members' shareholdings are not insured by any agency of the government. (U.S.Code, Cong. & Adm. News, 1959, Vol. 2, pp. 2784–2791.) They have increased from seven hundred and seventy-two unions in 1935 to over nine thousand in 1958; their assets, from over two million to over two billion, in the same period.

Ever since the Federal Bank Robbery Statute was enacted in May 1934, the Federal Bureau of Investigation has exercised jurisdiction over any violations. That statute now covers robberies, burglaries, and larcenies committed against member banks of the Federal Reserve System, banks insured by the Federal Savings and Loan Insurance Corporation, banks organized or operated under the laws of the United States Federal Savings and Loan Associations, institutions insured by the Federal Savings and Loan Insurance Corporation, and Federal Credit Unions. We see no reason to hold the latter category, organized and operating within the laws of the United States, should be any the less protected by the Federal Government than a bank likewise organized and operated under the laws of the United States. (Cf. Report, Federal Bureau of Investigation, 1961,

pp. 8–9.) That which the Federal Government has power to create and supervise it has power to protect.

2. We will next consider the alleged error of denying the respective motions to suppress, appellants' first procedural point.

A motion to suppress the evidence marked Exhibits A, B and C was made by appellant Mosco, and denied by the trial judge. (We keep in mind that Exhibit A was found in Mosco's car, and Exhibits B and C in his apartment.)

[3, ▉ ▉ searches, such as they were, were reasonable. They were not such as would shock the conscience of justice, nor were they contrary to one's sense of fair play. They were limited to appellant Mosco's apartment and to his automobile, and to Andersen's automobile used by Hansen; i. e., to areas over which appellants exercised dominion and control. They did not offend appellants' dignity (see, Blackford v. United States, 9 Cir. 1957, 247 F.2d 745), and the mere fact that there may have been an original trespass by law enforcement officers does not result in making any subsequent search and seizure invalid and evidence obtained thereby inadmissible (Teasley v. United States, 9 Cir. 1961, 292 F.2d 460, 461).

If a portion of the search of Mosco's apartment took place before the arrest was made, and it was, (for Exhibit C was found) the real question is whether a reasonable search and seizure can antecede a lawful arrest.[6] Did the officers enter the apartment with the intent, supported by probable cause, to arrest appellant? They did. Discovering appellant's absence, was the search of the apartment and the seizure of material evidence proper? When appellant entered the apartment he was immediately arrested. We note that immediately upon entering the apartment and ascertaining that appellant Mosco was gone, the officers had

6. The arrest was lawful within the test announced in Jones v. United States, 1960, 362 U.S. 257, 269–272, 80 S.Ct. 725, 4 L.Ed.2d 697, citing Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327.

placed a call to other units requesting the arrest and apprehension of Mosco.

The Supreme Court of California at least partially answered the question in People v. Simon, 1955, 45 Cal.2d 645, 290 P.2d 531. There that court said:

"In [citation] we held that a search incident to an arrest could not be justified in the absence of 'reasonable cause' * * * merely because it revealed that defendant was in fact guilty of a felony. Accordingly, the search of defendant's person may be justified only if he was committing or attempting to commit an offense in the officer's presence * * * or the officer had reasonable cause to believe he had committed a felony. * * * In such circumstances, however, it has been held that it is not significant whether the search precedes or follows the arrest. [Citations.] Thus, if the officer is entitled to make an arrest on the basis of information available to him before he searches, and as an incident to that arrest is entitled to make a reasonable search of the person arrested and the place where he is arrested, there is nothing unreasonable in his conduct if he makes the search before instead of after the arrest. In fact, if the person searched is innocent and the search convinces the officer that his reasonable belief to the contrary is erroneous, it is to the advantage of the person searched not to be arrested. On the other hand, if he is not innocent or the search does not establish his innocence, the security of his person, house, papers, or effects suffers no more from a search preceding his arrest than it would from the same search following it. In either case the important considerations are whether the officer had reasonable cause before the search to make an arrest and whether the

search and any seizures incident thereto were or were not more extensive than would reasonably be justified as incident to an arrest. See United States v. Rabinowitz, 339 U.S. 56, 60–64, [70 S.Ct. 430, 94 L. Ed. 653]. We conclude, therefore, that a search is not unlawful merely because it precedes rather than follows the arrest." [7] (Id. 290 P.2d at 533.)

As to the federal courts, the answer is presently different.

As the Supreme Court said in Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514, the "exceptions to the rule that a search must rest upon a search warrant have been jealously [guarded] and carefully drawn * * *." The exception which permits a search to be made without a warrant, if incident to a lawful arrest, is based upon necessity. Arresting officers must be able to protect themselves, to deprive prisoners of potential means of escape, and to avoid destruction of evidence by the arrested person. See United States v. Rabinowitz, 339 U.S. 56, 72, 70 S.Ct. 430, 94 L.Ed. 653, dissenting opinion of Justice Frankfurter, where the history of the rule, not disputed by the majority, is discussed. When a search without a search warrant is undertaken for these purposes, the arresting officers may also seize instrumentalities and means by which the crime was committed, the fruits of the crime such as stolen property, and property the possession of which is a crime. Harris v. United States, 331 U.S. 145, 153–156, 67 S.Ct. 1098, 91 L.Ed. 1399; Gilbert v. United States, 9 Cir., 291 F.2d 586, 594.

This rule of necessity obviously has no application if the arrest has not been made and cannot be made. No search under these circumstances could be made for the purpose of protecting officers in making an arrest, depriving an arrested

7. Footnote of the court: "1. In most of the cases cited for a contrary rule, [citing federal cases including Papani v. United States, 9 Cir. 1936, 84 F.2d 160, 164] there were either other reasons for holding the search unreasonable or the statement of the rule was dictum. * * *"

person of potential means of escape, or avoiding destruction of evidence by the arrested person. It follows that a search made prior to an arrest and at a time when the officers were physically unable to make an arrest cannot be regarded as "incident" to an arrest, within the meaning of the rule.

It has been held in some recent California cases that when a person is available for immediate arrest at the place of the search, the fact that the search preceded the technical arrest is immaterial. No federal court has gone even this far except where a moving vehicle has been involved. See Husty v. United States, 282 U.S. 694, 700, 51 S.Ct. 240, 75 L.Ed. 629. But assuming this rule may properly be embraced by federal courts with regard to the search of premises, it does not sanction a search made before the individual is available for arrest. As before stated, policy reasons which support the rule are not present in those circumstances.

In this particular case, moreover, it was a pure coincidence that Mosco appeared at his apartment within a few minutes after the search which uncovered Exhibit C. Officer Plevack, who was present during the search, testified that when Mosco was not found at the apartment, "I still didn't know whether he had left for good or was coming back or not." (R. 323) When Mosco did return one of the officers told him, "Gee, we didn't think you would come back," or words to that effect. (R. 325) Immediately upon entering the apartment and ascertaining that Mosco was gone, the officers placed a call to other units requesting the arrest of Mosco.

If it had turned out that Mosco was arrested somewhere else, or arrested at his apartment the following week, it could not have been said that the search which uncovered Exhibit C was incident to the arrest. This being true, it seems clear that the officers were without authority, at the time of the search, but seek to cloak the search with purported authority which, as a matter of pure co-

incidence, attached later when Mosco reappeared at his apartment.

■ As to Exhibit A, the established facts are that the search was made before any consent (however liberally construed) was obtained, and the purported "request" for Mosco's consent was pure sham. In our opinion the clear-cut violation of Mosco's Fourth Amendment rights, accomplished when Sage first searched the automobile without consent, cannot be cured by such a device.

Hence we conclude the motion of appellant Mosco was improperly denied as to both Exhibits A and C. He was denied the protection of the Fourth Amendment with respect thereto.

There is much evidence other than Exhibits A and C which tie-in Mosco to the crime. But we do not know, nor can we speculate, how much reliance was placed upon those two Exhibits by the jury in bringing in their verdict of guilty as to Mosco. For that reason we must remand the case for retrial on properly and lawfully acquired evidence.

As to appellant Hansen, he has neither alleged nor proven a basis for the conclusion that his personal rights were invaded in the search of Mosco's apartment, or of Mosco's automobile.

■ 3. The third point, like the second, is procedural. Was the government required to disclose the identity of its confidential source of information as to Mosco's alleged participation in a robbery?

We do not find the district court erred in denying appellant's request for disclosure of the identity of the government's confidential source of information. Appellants principally rely on Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. This was a case where the informant was involved in each of the transactions upon which the indictment was based. The government's evidence repeatedly included conversations between the defendant and "John Doe," the informant, which were overheard by the narcotic officers. This evidence was used to establish the

fact of defendant's possession of the narcotics, thereby establishing the basis for the employment of the statutory presumptions. Since "John Doe" was the only other person who could testify as to these conversations and transactions, his testimony was material and essential to a true determination of the facts. An additional consideration was the possibility that "Doe's" testimony would show entrapment of the defendant. The Court states, at page 62, 77 S.Ct. 623, 1 L.Ed.2d 639:

> "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

In the instant case, appellant Mosco, charged with robbery, had been identified at the trial by his victims. The defense of entrapment was not applicable, nor urged. Apart from the informer's evidence there was ample probable cause to arrest Mosco. The evidence at the trial discloses no missing material witness. Clearly, under the facts of this case, the trial court did not abuse its discretion in refusing to require the government to disclose the identity of its source of confidential information.

And it is noted that all the information received from this confidential source was corroborated by the independent observations and investigations of the officers.

III—OTHER ALLEGED ERRORS

The other issues or errors specified by appellants are not well taken. The record does not indicate that the trial court committed error in admitting into evidence the stocking found in Andersen's automobile (Ex. 4), or the money, or paper bags found in Ruth Martinez' traveling case, or the case itself (Exs. 10-A, 10-B and 10-C), or any other evidence. The court did not coerce the jury. The evidence (after excluding Exhibits A and C) taken most favorably for the government as we must on this appeal, is completely and amply sufficient to support the verdict and judgments.

There is no merit in appellant Hansen's ninth point as to error in the instruction given as to "reasonable doubt." The sentence of Hansen was not excessive.[8] The jury found appellant Hansen guilty of robbery with a dangerous weapon (R. 914) which offense requires, and necessarily includes, the element of force.[9]

There is no merit in the alleged misconduct of counsel for the government questioning Mosco. Immediately, once objection was made by Mosco's competent counsel, such objection was sustained. The court further instructed the jury, at the request of Mosco's counsel, to disregard the incident (R. 682–685). Such a trivial incident, immediately corrected, cannot be read by us to contaminate the entire trial, particularly in a case where the evidence of appellant's guilt is as convincing as it here is.

The judgment of conviction of appellant Mosco is reversed and remanded for a new trial.

The judgment of conviction of the appellant Hansen is affirmed.

8. Twenty years.

9. "§ 1951. **Interference with commerce by threats or violence** \* \* \*
"(b) As used in this section—
"(1) The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."