CHARLES E. SCHAFFER, Appellant, v. THE STATE OF DELAWARE, *Appellee.*

RAYMOND CHALMERS, Appellant, v. THE STATE OF DELAWARE, Appellee.

(*September* 7, 1962.)

(Reargument denied October 10, 1962.)

SOUTHERLAND, Chief Justice, and WOLCOTT, Justice, and DUFFY, Judge, sitting.

*David Kanner* (of Philadelphia, Pa.) for Appellant Charles E. Schaffer.

*David Snellenburg, II*, for Appellant, Raymond Chalmers.

*W. Laird Stabler, Jr.*, Deputy Attorney-General, for the State.

Supreme Court of the State of Delaware, Nos. 51 and 52, Cr. A., 1961.

DUFFY, J.:

Raymond Chalmers and Charles E. Schaffer were con-

victed of burglary in the third degree, and they appeal. The facts are these:

On Friday evening, September 30, 1960, after 7 P.M., Dr. Edwin Fluevog cashed a $175 check at the Wilmington Trust Company. The teller gave him eight new $20 bills, one $10 bill, and one $5 bill. Dr. Fluevog put the bills in his wallet. He then went to another part of the Bank and bought a bond for $75; he paid for this with three of the new $20 bills, a $10 bill, and a $5 bill.

On Saturday, October 1, Dr. Fluevog took one of the $20 bills from his wallet and put it in a box in a desk drawer in his home. He dined at a restaurant that evening and paid his check with one of the $20 bills.

On October 1, between 6:15 P.M. and 11:20 P.M., Dr. Fluevog's home was burglarized and the $20 bill was taken from the box in the desk drawer. The home had been ransacked after entrance was made through an open window protected by a screen. Grass trimmings were found on the floor. Dr. Fluevog had cut his lawn earlier in the day.

On October 2, at about 12:20 A.M., police officers saw Chalmers and Schaffer walking on Marsh Road about two miles from Dr. Fluevog's house. Both were dressed in black, their trousers were wet to the knees and grass and particles of mud were on the cuffs. Neither man had a wallet or identification data.

Chalmers and Schaffer were taken to the police station and there questioned at about 1 A.M. Schaffer was asked to empty his pockets. He did so and produced, among other things, a new $20 bill. All items were returned to him. At about 2:40 A.M., he was again asked to produce the $20 bill. He did so. At that time both defendants were arrested and charged with the burglary.

In these appeals defendants make three arguments, which we consider *seriatim*.

(1) Defendants first contend that the State did not prove that the $20 bill which Schaffer produced at the police station was the same bill taken from Dr. Fluevog's home. The State tacitly concedes that its case against defendants depends upon proof of this connection. And, as the trial judge stated in his instructions to the jury, the State's evidence on this point is wholly circumstantial.

Circumstantial evidence, to establish a fact in issue, must be inconsistent with any other rational conclusion. *Holland v. State*, 9 Terry 559, 107 A. 2d 920 (1954). Let us test the evidence here by this principle, which has been repeatedly applied by our courts.

Miss Elizabeth Bowman, the teller who cashed Dr. Fluevog's check, testified that all bills are numbered and that all new money runs in series. Dr. Fluevog asked her for new $20 bills. Following her usual practice, she determined by reference to the serial numbers the appropriate number of such bills to be removed from a package of new money. She then removed these bills from the package, counted all of the money and handed it to Dr. Fluevog. While Miss Bowman's testimony as to the countdown on the $20 bills was general, it reflected "an invariable regularity of action, a fixed and constant procedure" and was therefore admissible, *Pennsylvania Co., etc. v. Philadelphia Electric Co.*, 331 Pa. 125, 200 A. 18; *Wigmore on Evidence* (3d ed.) § 92; and, coupled with Dr. Fluevog's testimony, it provides a basis for concluding that the eight $20 bills received by him were numbered in series.

Dr. Fluevog put the bills in his wallet. Following his habit, he took $20 bills from the front, or "top", of such bills in his wallet as he used them. After the burglary, $20 bills with the following numbers remained in Dr. Fluevog's wallet: C 270 42769 A, C 270 42770 A, and C 270 42771 A. A $20 bill with the following number was received during the evening of October 1 by the restaurant in which Dr. Fluevog dined that

night: C 270 42772 A. The $20 bill produced by Schaffer on the morning of October 2 had the following number: C 270 42773 A.

The evidence directly establishes that the bills were in series and that Dr. Fluevog took them from his wallet in order as he used them. It also establishes that bills bearing the numbers C 270 42771 A, C 270 42770 A, and C 270 42669 A were at one "end" of the series. And the number of the bill given to the restaurant, C 270 42772A, indicates the direction of the other end of the numbered series, *i.e.*, up...

Since there were eight bills involved, the irresistible conclusion is that the three bills at the other end of the series were numbered C 270 42774 A, C 270 42775 A, and C 270 42776 A. This leaves for accounting only C 270 42773 A, and that was the number of the bill Schaffer had.

This analysis is confirmed by the testimony as to the methodical way in which Dr. Fluevog removed the bills from his wallet: first, in turn, were the bills used to buy the bond, then came the bill placed in the box, and, finally, the bill used to pay the restaurant. The three unused bills were in his wallet after the burglary.

■■ To summarize: The fact in issue is the number of the $20 bill Dr. Fluevog put in the box in his home. The only rational inference from the State's evidence, or at least the jury could so conclude, is that the bill was numbered C 270 42773 A. This was the bill found on Schaffer the night of the burglary. And possession of recently stolen property, coupled with proof of the *corpus delicti*, is sufficient to sustain the conviction. *State v. Edell*, 7 W. W. Harr. 404, 183 A. 630.

We also note that the grass and mud on the clothing of defendants, the circumstances under which defendants were found by police, and their conflicting statements to the police all tend to corroborate the jury's verdicts.

■ (2) Defendants next contend that the trial judge erred in denying a motion for a mistrial based upon testimony given by a police officer as a State's witness. The following occurred on cross examination:

"The Court: Will you put the question over again, please.

"Q. Didn't Schaffer, because you had asked him whether he committed this burglary, tell you, 'No', and then tell you where he started out from up until the time he had been picked up, describing the car and the front seat, etc.?

"A. Yes, sir.

"Q. Was that question practically admitting this entire thing?

"A. He said that he didn't want to talk about any burglary. I ask him whether he had been involved in any other crimes in the past, which I will not bring out at this point." The motion was based upon the last sentence quoted above.

In denying the motion, the trial judge interpreted this language as meaning that Schaffer was questioned about other crimes without any implication that he was involved in them. The Court so stated to the jury and also explicitly instructed the jury that it was not to draw any inferences from the officer's answer.

Quite clearly, the answer was not responsive to the question and should not have been given. The trial judge's comment, however, put the testimony into proper perspective and cured the error. Compare *Miller v. State*, 11 Terry 579, 137 A. 2d 388. As to the objection based upon the language that the Court used in its instruction, we note that no objection to this was made at the time the instruction was given. And, in any event, we conclude that the language did not "accentuate" the matter, as defendants contend.

(3) Defendants also contend that the $20 bill in question was illegally seized because it was taken from Schaffer after expiration of the two-hour detention period provided for in 11 *Del. C.* § 1902. The statute, in effect, authorizes a detention for a maximum of two hours and directs that at the end of "the detention the person so detained shall be released or be arrested and charged with a crime".

According to the testimony of one of the police officers, they first observed Chalmers and Schaffer "at approximately twenty minutes after twelve" and, after some questioning, decided to take them to Route 13, a main road leading in the direction of Norfolk, Virginia, the place which Chalmers and Schaffer gave as their destination. Upon finding that they were without wallets or identification, the officers decided to take them to the police station; this decision made "after twelve-thirty". At about 2.40 A.M., Schaffer produced the $20 bill for the second time and it was then seized by the police officers. This evidence obviously does not establish that the $20 bill was seized within the two-hour period.

██ Evidence seized in violation of the constitutional prohibition against unreasonable searches and seizures, Art. 1 § 6, *Del. C.*, is not admissible in this State at the trial of the person whose rights have been violated. *Rickards v. State*, 6 Terry 573, 77 A. 2d 199. But it does not follow that evidence obtained after expiration of the statutory detention period permissible under 11 *Del. C.* § 1902 necessarily violates the constitutional guarantee. On the contrary, it is admissible with the affirmative consent of the person owning or in possession of the property to be searched. We recognize that under certain facts a trial court can and should state, as a matter of law, that such consent was not given. But such facts are not in the present record.

There is no evidence of actual coercion or duress with respect to production of the $20 bill. Hence, such factors

must be inherent in the circumstances if they were there at all.

Neither defendant testified. Detective Fugate, who talked with both defendants, testified, in effect, that during the detention period Schaffer was asked to empty the contents of his pockets, that he did so, that the items were returned to him, that he was later asked to produce the $20 bill and he did so. The Detective further testified that Schaffer did all of this voluntarily and that he was "very jovial all the time". In the light of this testimony, which is not contradicted, we cannot say, as a matter of law, that Schaffer could not freely give his consent to the seizure. Stated otherwise, we think there was evidence from which it could reasonably be concluded that the $20 bill was produced voluntarily and freely by Schaffer, who had it in his possession.

The bill was "tentatively" admitted into evidence by the trial judge under appropriate instructions which permitted the jury to ultimately determine whether or not Schaffer gave consent to the seizure. In this respect the Court followed, and we think quite properly, a procedure analogous to that used when a confession is admitted. Compare *Wilson v. State*, 10 Terry 37, 109 A. 2d 381. The jury obviously concluded that Schaffer freely gave his consent to the seizure and we find no reason for disagreeing.

Defendants rely largely on the Superior Court's opinion in *State v. De Koenigswarter*, Del. Super., 177 A. 2d 344, to support their contention that effective permission for the seizure could not have been given. That case, however, involved substantially different facts. Here there were no beatings by police officers nor other conduct creating the atmosphere of duress which the Court found in *De Koenigswarter*.

Since the bill was not seized in violation of Schaffer's constitutional rights, it follows that no constitutional rights of Chalmers were violated.

The judgments are affirmed.

On Defendants' Petition for Reargument.

▮▮ Defendants petitioned for reargument of the Court's opinion of September 7, 1962 on the ground that, as a matter of law, a person who is in police custody cannot consent to a search and seizure. Six Federal cases are listed in the motion, without comment or quotation: *Mosco v. United States*, 301 F. 2d 180 (9 Cir.); *Cohen v. Norris*, 300 F. 2d 24 (9 Cir.); *Kelley v. United States*, 111 U. S. App. D. C. 396, 298 F. 2d 310; *Cochran v. United States*, 291 F. 2d 633 (8 Cir.); *Taglavore v. United States*, 291 F. 2d 262 (9 Cir.); *United States v. Valentine*, 202 F. Supp. 677 (E. D. Tenn.).

Several of these cases are readily distinguishable on their facts. Thus in *Mosco* the Court held that the first search of the car, made by the police without Mosco's knowledge, violated the Fourth Amendment and securing consent to a second search (when the police knew what was in the car) was a mere sham. And in *Cohen* the Court considered the sufficiency of a complaint under the Civil Rights Act. 42 U. S. C. A. § 1983. As to *Cochran*, the Court held unlawful a search of defendant's apartment by police acting solely on "the unsubstantiated suggestion of a perfect stranger that * * * [defendant] *may* be good for the hold-up". *Taglavore* involved brutality to defendant's person by the police after they had used an alleged traffic violation as a device for taking defendant into custody. In *Valentine* law officers searched defendant's automobile, acting solely on a "tip" by an unidentified informant that "an old model Chevrolet automobile with Unicoi County" license plates was being used to transport illicit whiskey; defendant's automobile fitted the description but the Court held that this did not amount to probable cause to search.

This leaves *Kelley* for our consideration. In that case the context in which defendant produced the marijuana from his

person was different from that reflected in the present record. The opinion leaves little doubt that the threat of police "pressure" lay heavily upon defendant as he was ordered to "pullout" the marijuana which he said he had. Here the record is completely free of any coercive action or attitude by the police, except to the extent that coercion is inherent in police custody. Such a conclusion may be implicit in the result reached in *Kelley*, but that Court did not say so. If it is not implicit, that distinguishes the case. If it is, we decline to follow it. We do so because, in our judgment, such a holding, with all of its obvious ramifications, would seriously jeopardize policy inquiry and investigation long considered both lawful and necessary.

 Under the earlier opinion in this case the conduct of police who take or receive property from a person in custody may be scrutinized first by the Court and, if the Court so decides, thereafter by the jury. In our opinion this procedure provides a reasonable method for protecting both the public interest in legitimate law enforcement and the Constitutional rights of an accused.

The motion for reargument is denied.