**UNITED STATES of America**

v.

**Tomas Santana ORTIZ.**

**Crim. No. 187–68.**

United States District Court,
D. Puerto Rico.

Jan. 5, 1971.

Gerardo Ortiz Del Rivero, San Juan, P. R., for plaintiff.

Julio Morales Sanchez, U. S. Atty., San Juan, P. R., for defendant.

## OPINION OF THE COURT

CANCIO, Chief Judge.

Defendant Tomas Santana Ortiz was charged by the Grand Jury of this Court for a violation of Title 18 U.S.C., Section 1709. The Indictment alleges that Defendant, on February 13, 1968, in San Juan, Puerto Rico, and while working as a postal employee of the Post Office Department, embezzled the amount of $31.-00 contained in eight separate and different letters, all air mail and addressed to Rev. Luis M. Ortiz, G.P.O. Box 3644, San Juan, Puerto Rico, 00936. The Indictment further alleges that the monies had come in Defendant's possession by virtue of his employment and that such letters were intended to be conveyed by air mail and to be forwarded through the Post Office Department.

Defendant entered a Plea of not guilty. Prior to trial, Defendant filed a Motion for Suppression of Evidence and for Return of Property.

The case was called for trial on December 9th, 1969. In view of the fact that the evidence in the case in chief was the same as the evidence which would be presented in relation to the Motion for Suppression of Evidence, the Court ruled that it would entertain the said Motion at the trial.

The Government presented several witnesses and documentary evidence in support of its case. When the Prosecution rested, the Defendant presented one witness in support of his contentions. The case was then submitted and the Court ordered the parties to file Memoranda. Defendant filed his Memorandum on February 9, 1970. The Government never filed its Memorandum.

In his Motion For Suppression of Evidence Defendant contends that the search and seizure made in the instant case is unconstitutional. He further contends that the Indictment is fatally defective.

To support the indictment the Government presented three witnesses, to wit: Witness Juan Enrique Barrios, Witness Norberto Stewart, and Witness Ramon Rivera. The Prosecution also introduced documentary evidence.

Government witness Barrios testified, substantially, that he is an investigator of the Post Office, R. p. 9.; that

around the early part of February, 1968, he was conducting an investigation relative to letters that were missing from certain boxes at the General Post Office box section, R. p. 9.; that some "test letters" were prepared by his office; that the purpose of a "test letter" is to know if such mail arrives to the addressee. know if such mail arrives to the addressee; that these letters were prepared with the regular envelopes of Reverend Luis M. Ortiz, Box 3644, San Juan, Puerto Rico; that one dollar bills were placed on all of these letters addressed to the Reverend, R. pp. 10–11. Subsequently, these letters were placed in a tray where Defendant Santana would handle them and encase them in the boxes. That all over the General Post Office they have galleries with one way mirrors and they can see what the employees are doing in all parts of the Post Office; that he and Government witness Stewart saw when the letters were placed on the case of the Defendant, R. pp. 11–12; that the Defendant was working the 7:30 P.M. to 3:30 A.M. shift. That while they were at the look out observing, they noticed that the Defendant was putting some letters aside and afterward putting them in his pocket. Later on, the Defendant went to the bathroom and also to the parking lot of the Post Office, R. pp. 12–13. Afterwards they looked for the "test letters" and were never found; that on February the twelfth after they (the officers) had placed other "test letters" in Defendant's case, they noticed that Defendant took them, put them in his pocket and made some trips to the bathroom and parking lot, R. pp. 17–18.

When Defendant finished his shift and was ready to leave and while he was entering his car one Mister Stolberg approached the Defendant and identified himself as a Postal Inspector. Mister Stolberg told the Defendant of his purpose in talking to him, R. p. 19. At this time the Defendant was accompanied by one John Rivera. Inspector Stolberg told the Defendant about the Investigation he was conducting and immediately warned the Defendant about his rights, R. p. 19.

Stolberg advised the Defendant about the right to have an Attorney in the presence (sic), his right to remain silent and that if he did not want to he did not have to answer, R. p. 19; that if he did not have money for a lawyer they would get a lawyer for the Defendant, R. p. 20, then Stolberg questioned the defendant about the letters he was looking for and the Defendant while he was in the car, agreed to the search of the car, R. p. 20. Searching the car, the Inspector, found the money that had been stolen from the letters, R. p. 21. The Defendant was then taken to the Postal Inspectors' Office and there he signed a waiver of rights Exhibit 5 for the Government, R. pp. 22, 23. After signing the waiver of Rights the Defendant gave a written confession in which he admitted stealing the missing money. Exhibit 7 for the Government, R. p. 23. Defendant also admitted that he had stolen money from other letters not involved in this case. This money was found in Defendant's pocket when they searched his person R. p. 25.

On cross examination Inspector Barrios stated that the first time he saw the defendant stealing letters was on February the ninth, 1968, R. p. 26, and that he did not arrest the defendant on said date R. p. 31. On February tenth and eleventh, 1968, nothing happened R. p. 31. On February 13, 1968, the defendant was walking toward his car with Employee John Rivera, when Mr. Stolberg stopped him, R. pp. 33–34. Inspector Stolberg asked the Defendant for permission to search the car. The Defendant was nervous, R. p. 35. The Defendant was not being detained, R. p. 36. Inspector Barrios never heard the word "arrest" during these incidents, R. p. 38. The Defendant was stopped around four or four-thirty in the morning R. p. 39. During the questioning the Defendant was pale and nervous R. p. 43. Defendant told the Inspector that he wanted to keep on working in the Post Office, that he did not want to be thrown out of his job, he was anxious because he was losing his job, R. p. 50. The defendant was expecting leniency, R. p. 52. The questioning

could have ended between five thirty and six in the morning, R. p. 47.

The next Witness for the Government was Inspector Norberto Stewart, R. p. 54, who, substantially testified that nothing was promised to the Defendant in exchange for his confession but that as a matter of fact the defendant begged to keep his job. R. p. 57.

In cross examination Witness Stewart stated that the questioning ended about four thirty in the morning, more or less, R. p. 59. That they had breakfast in the Postal Inspector Office and that he thinks that they took the Defendant before the United States Commissioner about nine o'clock in the morning of February 13, 1968.

The next witness for the Government was Postal Employee Ramon Rivera. His testimony was stipulated by the parties. He was the person who placed the letters in the receiving box and then later ascertained they were not there, R. pp. 62–63. Then Government then rested. R. p. 63.

The Defense presented only one witness to wit: John Rivera, a Postal Employee, who testified as follows: He has been working for the Post Office for 28 years and is still working. He knows the Defendant. Does not work in exactly the same division of the Defendant but they are very close to each other. On February 13, 1968, R. p. 65, at three-thirty in the morning he was going with the Defendant toward the parking lot. When they were near the car, the car they were supposed to travel in, he heard somebody, can not say whose voice was, but that voice said "stop here and don't open that car". It was something to the effect of stopping it and then, one of them, don't know which of the men, because there were three of them, running toward them. They were Mr. Stewart, Mr. Barrios and Mr. Stolberg, D. p. 65. They came to the car and ordered the Defendant to open the car, because it had to be opened and two of them went in, went into the car and the other went to the rear of the car. They searched the car. One of them who was inside the car said "it's right". They came back with nothing. At the same time lots of other guys were coming out. They were other employees. That's why he could not see what the Inspector was carrying out. After the search he stayed with the Defendant. Mister Stolberg was present all the way, R. p. 66. Also Mister Barrios and Mister Stewart. They went upstairs to the Inspectors' office. There they brought a big envelope and got some bills out of the envelope. The defendant was so nervous that he could only mutter something. He (the Witness) could hardly understand the Defendant R. p. 67, he was in a kind of shock, R. p. 68. He was told what to write in most of the cases because of his mental condition R. p. 69. The Defendant was awfully nervous, he could hardly talk, R. p. 69. He saw the Defendant write and sign the confession, R. p. 69. They arrived at the Postal Inspector's office about 3:30 in the morning and spent about three hours or three and a half hours there. When they came out it was almost daylight, about seven o'clock in the morning, R. p. 70. After signing the confession they let the defendant go away. They told the Defendant to come back at two o'clock, R. p. 71. They told the Defendant that if he would sign the confession everything will stay there, that he could go back to work in the post office in six months, R. p. 71. The Defendant was scared to lose his job, having family and so on. Of course he wanted to remain in the service. The witness stated that his record is clean and has never been in trouble with the Post Office.

In cross examination by the Government, Defense witness John Rivera stated that the only thing promised (to the Defendant) was that in exchange of the declaration he (Defendant) would be given the chance to go back R. p. 75. They promised him (the Defendant) "you sign this and you can come back" R. p. 76. The witness signed the Waiver of Rights of Defendant (Exhibit 5 for the Government), R. p. 77. The Witness does not know at what stage of the meet-

ing the promise were (made) but they did happen, R. p. 79.

The Fourth Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized".

The exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn and search incident to a valid arrest is among them, Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514; United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59; Johnson v. United States, 333 U.S. 10, 14–15, 68 S. Ct. 367, 92 L.Ed. 436.

■■ Experience has taught us that the two exceptions most frequently relied upon by the prosecution to support a *warrantless search* are the doctrine of incidental searches and the doctrine of consent searches. In the instant case it was clearly established by the evidence that there was *no search or arrest warrant issued*. Once the Defendant establishes that the officers acted without a warrant, the burden shifts to the prosecution to go forward with the evidence. The prosecution must establish that the warrantless search and seizure comes within one of the exceptions to the warrant requirement. Does the search in this case fall within one of those exceptions? We respectfully contend that it does not. As a matter of fact the government is estopped from claiming that the search was incidental to an arrest. The government's evidence consistently establishes that the Postal Inspectors when they stopped the Defendant at the parking lot they just "told Mr. Santana (the defendant) about the investigation Mister Stolberg was conducting and that he was going (Stolberg) to talk to the Defendant about this investigation and immediately after that Mister Stolberg warned the Defendant about his rights, R. p. 19; see also R. pp. 34, 35. At. R. p. 36 Witness Barrios is asked by Counsel for the Defendant if Mister Stolberg was warning the Defendant that *he was being detained* and the witness answered, *"Not being detained"*. When asked *why* did Mister Stolberg *advised* the Defendant, witness Barrios answered that the Postal Inspector has the right to inquire any employee on the grounds, and asked him incriminating questions and if the person wants to answer them he answers, *see* R. pp. 38–37.

Nowhere in all the Government's testimony can we find that there was an arrest at the parking lot or that the real purpose of stopping the Defendant was to arrest him. It should also be noted that on February 9, 1968, the Defendant was seen taking letters and putting them in his pocket and was not arrested either, *see* R. pp. 60–61. *See also* R. p. 31. But more important is the fact that according to witness Barrios, Inspector Stolberg *asked* the Defendant for permission to search the car and the Defendant agreed, R. p. 35. If the officers were arresting the Defendant at the parking lot *they did not have to ask for permission to search the car*. The officers actions indicate that there was no intention to arrest the Defendant at that time. The true purpose of the officers was a "fishing" expedition. They were trying to strengthen their case before arresting the defendant. That was the reason for searching the car first, then obtaining a waiver of Rights Exhibit 5 for the Government, and a confession Exhibit 7 for the Government). Even then, no arrest was made and the defendant was allowed to go and told to come back at two in the afternoon, R. pp. 70–71.

■■ The search in the instant case *preceded the arrest*. Since it is the arrest that confers the power upon the officers to make an incidental search of the premises as well as the person, the search must follow the arrest, and not precede it. Police officers even though they have probable cause to believe that certain articles subject to seizure are within a

building, may not enter the premises without a search warrant. They may not search for and seize the article and *then* arrest the defendant. The search, therefore cannot precede the arrest, Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514. In Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828, the Supreme Court held that the federal officers had probable cause to believe that a "still" existed on the Defendant's premises but nevertheless failed to obtain a search warrant before raiding the premises. The Court held that time for obtaining a warrant had been available. Therefore, the ensuing search of the premises and seizure of the still was unconstitutional. See also Mosco v. United States, 301 F.2d 180 (9 Cir.) ; Lee v. United States, 98 U.S. App.D.C. 97, 232 F.2d 354; Steeber v. United States, 198 F.2d 615 (10 Cir.) ; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. In the instant case the officers had all the time they wanted to obtain a warrant. Furthermore, a search incident to arrest (which is not the case here) must be *reasonable.* General and exploratory searches in the hope that evidence of crime might be found are universally condemned as unreasonable and violative of the Fourth Amendment, *even though incident to a valid arrest.* Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877; Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876. In the present case the officers informed the defendant of the purpose of the investigation that was being conducted, R. p. 34, and Mister Stolberg was going *to talk* to the defendant about said investigation, R. p. 19. In other words, the officers were "exploring".

■ The Prosecution never made any showing of *impracticability* to obtain a warrant notwithstanding the fact that the officers could have arrested the defendant *hours and even days* before they really arrested him. *See* Niro v. United States, 388 F.2d 535 (1 Cir., 1968).

When officers have the opportunity to make an arrest, a deliberate *delay* until the person to be arrested *has entered* particular premises—so that the officers may search those premises without a warrant—renders the search invalid regardless of the validity of the arrest, McKnight v. United States, 87 U.S.App.D.C. 151, 183 F.2d 977.

■ An automobile is a protected area within the Fourth Amendment Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134; Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688. Since the rule which permits an officer to search an automobile without a warrant is based on the ground that "It is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought", it is clear that *only mobile vehicles* may be searched without a warrant. In any case where the vehicle is not mobile, as where the Defendant has already been taken into custody prior to the search and, *the car is parked in the street or in a garage,* the police may not search the car without a search warrant. *See* United States v. Stoffey, 279 F.2d 924, 929 (7 Cir.), where automobile was searched without a warrant at a time when it was not in *movement* and was not occupied by the Defendant at the time of the search or at the time of his arrest. The Court held the search unreasonable. *See also* Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629; Hart v. United States, 162 F.2d 74 (10 Cir.) ; Rent v. United States, 209 F.2d 893 (5 Cir.). Here Defendant was stopped while going towards his car which was *parked* at the parking place of the Post Office.

■■ For the above stated reasons the Court finds that the search in this case is unreasonable and void, and that it does not fall within the narrow exceptions established by the Supreme Court which permit a search without a warrant when incident to a valid arrest. Nor does this search fall within the "consent searches" because the Prosecution did not meet the burden it had to show that

the strict requirements of a waiver had been met. "Courts indulge every reasonable presumption *against* waiver of fundamental constitutional rights", Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. To determine whether the consent was voluntary, the Courts generally have applied a totality-of-the-circumstances test. The issue is phrased in terms of whether consent was given in an exercise of free will, of whether it was given in acquiescence to, or in peaceful submission to, an assertion of authority by the police. That the Defendant is under arrest—even though lawful—may be enough in itself, to invalidate his subsequent consent to search, Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649; Channel v. United States, 285 F.2d 217 (9 Cir.). Most courts which have treated the issue have decided that the failure to advise a person *of his right to refuse* is one of the circumstances to be considered in applying the totality test, *see, e. g.* Rosenthall v. Henderson, 389 F.2d 514 (6 Cir.) Gorman v. United States, 380 F.2d 158 (1 Cir., 1967); *Cf.* Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (appraisal of right to remain silent and right to counsel is a *prerequisite to waiver of these rights*). In the instant case the defendant was stopped by the Postal Officers. According to the evidence presented by the Government the defendant *"agreed"* to the search of his car, R. p. 20, but at R. p. 35 the same Prosecution witness testifies that Inspector Stolberg *asked* the defendant for permission to search the car. All of which reminds us of Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819. In that case the police testified that they had identified themselves as policemen, told the defendant that they had information that he was engaged in narcotic drug traffic, and that the defendant consented to the search of his room. The Court ruled that the record did not support the finding that appellant consented to the search, and that the motion to suppress should have been granted. Among other things the Court stated: *"But no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered."* A court may not accept the testimony of an agent which is *contrary to common sense and human experience. See also* Catalanotte v. United States, 208 F.2d 264 (6 Cir.); Higgins v. United States, *supra,* 209 F.2d 819; United States v. Adelman, 107 F.2d 497 (2 Cir.). We will assume for present purposes that the officers' testimony was true and that defendant had the money in the car. Even so, the record does not support a finding of consent to search. What the record supports is a finding that Defendant was acting *in acquiescence* to an ascertion of authority by the Postal Inspectors. He was afraid of them, they were his superiors. And let us remember the words of Mr. Barrios, the Government witness, who stated that the Postal Inspectors *has the right to inquire any employee* on the grounds, R. p. 37, and *ask incriminating questions,* R. p. 37. It should also be noted that the *Waiver of Rights, Exhibit 5 for the Government* was *not signed at the Parking lot,* it was given to the defendant at the Postal Inspectors' Office on the second floor of the Post Office Building, about five o'clock in the morning of February 13, 1968, R. pp. 39–40.

■ After having obtained a Waiver of Rights from the Defendant, the Postal Inspectors obtained a written confession from defendant (Exhibit 7 Govt.) This confession is null and void for several reasons; first, it is the "fruit" of an unreasonable search and seizure. The exclusionary rule encompasses not only the physical evidence actually seized, but also any other evidence discovered as a result of an unreasonable search and seizure. This rule, commonly referred to as the "fruit of the poisonous tree" doctrine, has been expressed by the Supreme Court as follows:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court *but* that it shall not be used at all." Silverthorne Lumber Co. v. Unit-

ed States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

In applying this rule the Supreme Court has written:

" * * * verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

Even if the instant search was legal, which we hold it was not, the resulting so-called confession is null and void because it was obtained in violation of the McNabb-Mallory Rule as established by the Supreme Court of the United States.

In McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, the Supreme Court interpreted and applied Rule 5(a) of the Federal Rules of Criminal Procedure which provides, substantially, that an officer making an arrest with or without a warrant, shall take the arrested person *without unnecessary delay* before the nearest Commissioner. The McNabb Rule requires that any incriminating statements obtained during a period of "illegal detention" be barred from use on the defendant's trial. Detention, in turn, is illegal if the accused is not brought before a Federal Commissioner for arraignment following his arrest. Some delay is permissive. The delay, however, may not be for interrogation purposes.

The McNabb Rule was reemphasized, and expanded, by the Supreme Court in 1957 in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. While the emphasis in McNabb is upon the necessity for prompt production of an arrested person before a Magistrate, Mallory stresses that the Defendant is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself to eliciting damaging statements to support the arrest and ultimately the defendant's guilt.

In the instant case the unnecessary delay in bringing the defendant before a Commissioner is clearly seen. It should be noticed that the Government witness Stewart states at R. p. 59 that he *"thinks"* that the defendant was taken before the Commissioner at nine o'clock in the morning *but he is not sure*, R. p. 59. Defense witness John Rivera stated that the officers let the defendant go about seven o'clock in the morning and told the defendant to come back at two in the afternoon, R. pp. 70–71.

All these facts clearly establish that the so-called confession was obtained during a period of illegal detention in violation of the McNabb-Mallory Rule and, therefore, said confession and the rest of the evidence should be suppressed, inasmuch as they are Constitutionally tainted.

For the above stated reasons, it is clear that the search in the instant case cannot be upheld as a "consent search" or as a search incident to a lawful arrest. The totality of the circumstances is against it. Therefore the evidence should be suppressed.

It is so ordered.