JONES *v.* UNITED STATES.

No. 331.   Argued April 7–8, 1958.—Decided June 30, 1958.

*Wesley R. Asinof* argued the cause and filed a brief for petitioner.

*Eugene L. Grimm* argued the cause for the United States.  With him on the brief were *Solicitor General Rankin, Acting Assistant Attorney General Foley* and *Beatrice Rosenberg.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

After a trial without a jury in the Federal District Court for the Northern District of Georgia, petitioner was found guilty of various violations of the federal liquor laws, stemming from and including the possession of an unregistered still. See 26 U. S. C. (Supp. V) §§ 5601, 5216, 5008, 5681. His claim is that some of the evidence used against him at the trial should have been suppressed because it was obtained by an unlawful search and seizure by federal officers, and that its admission vitiates his conviction. The importance of maintaining strict standards for the admissibility of evidence so challenged in the federal courts led us to grant certiorari. 355 U. S. 810.

Federal alcohol agents received information on April 30, 1956, that petitioner's farmhouse near Dawsonville, Georgia, was the site of an illicit distillery in current operation. Investigating this lead, the agents discovered spent mash, a product resulting from the distilling of alcohol out of mash, in a hollow behind petitioner's house. The running mash emerged from a concealed rubber hose which, when traced as far as was consistent with caution, led close to petitioner's home. On May 1, four federal agents and one state officer returned to this vicinity. The officers observed mash still emerging from the hose, detected the distinctive odor of hot mash from the direction of the house, and heard coming from within the house the sounds of voices and of a blower burner, commonly used in that area to heat distilleries.

At 2 a. m. on May 2, the officers abandoned their watch and returned to the nearby city of Gainesville. During the day, Federal Agent Langford obtained from the United States Commissioner there a *daytime* search warrant for petitioner's house on the basis of an affidavit

describing what had been discovered and asserting the officer's belief that the house sheltered an illicit distillery. Late that afternoon, but still in daylight, the five officers resumed their surveillance of the house. Rather than execute the daytime warrant at once, they decided to make further observations to determine which parties were implicated in the operations and whether any vehicles were being used.

About 9 p. m., after darkness had set in, a truck entered petitioner's yard and retreated out of the officers' sight behind the house. Loud noises were heard, and when the truck shortly thereafter sought to regain the public road in front of the house, it became stuck in petitioner's driveway. The officers arrested the two men in the truck and seized what turned out to be 413 gallons of nontaxpaid liquor. At that time a passenger car carrying petitioner's wife and children drove into the yard. The wife rushed to the house and reached the doorway before the federal officers who were then advancing towards it. She sought to block entry by placing her arms across the door, and when informed by Langford of his identity as a federal officer, she demanded to see his search warrant. Langford said that a warrant was not required, and the officers brushed past Mrs. Jones into the house, seizing from the hands of her young boy a shotgun which he was brandishing in an apparent effort to prevent entry.

In the house at that time, in addition to Mrs. Jones and the children, were petitioner's father and brother. The officers did not arrest any of them, but immediately engaged in a general search of the house. The evidence later admitted against petitioner at the trial, including a boiler, fuel burner, and 15 barrels, was seized in rear rooms and in the attic. Petitioner was arrested when he returned to his house about one hour after the search had been completed.

Petitioner moved before trial to suppress the use in evidence of the articles seized in his home. During the hearing on this motion, the Government conceded that by the time petitioner's house was searched the daytime search warrant had expired, and it disclaimed any intention on the part of the federal officers to execute it. Rather it urged that ". . . it is the reasonableness of the search which is under question." Federal Agent Evans testified that he thought a nighttime search warrant could be dispensed with because ". . . the crime was being committed in our presence, at least I assumed we had probable cause for that."[1] And Agent Langford explained his position by stating: ". . . I thought we had sufficient evidence to go in the premises without a search warrant."[2] The court, in denying the motion to suppress, entered findings of fact and conclusions of law wherein it stated:

"The court finds that the facts and circumstances within the knowledge of the officers were sufficient in themselves to warrant a man of reasonable caution

[1] This witness further testified: "Q. What crime did you see committed inside the house before you went inside to search the place? A. I didn't see any crime. Q. What crime did you say was committed in your presence? A. The one I saw was the transporting of the whiskey out through his yard. Q. Through his yard? A. Yes, sir. Q. You stopped that truck, didn't you? A. Yes, sir. Q. You arrested the occupants of that truck, did you not? A. Yes, sir. Q. Neither one of the occupants of that truck fled into that house, did they? A. No, sir. Q. So you had no knowledge that anyone else was even in the house, had you? A. If you mean by 'knowledge,' did I see anyone else inside the house, no, sir."

[2] On cross-examination, Langford testified: "Q. Mrs. Jones did ask you not to come in, did she not? A. That is correct. Q. Mrs. Jones asked you, did she or not ask you to wait until her husband got there? A. I believe she did, yes." These answers amplified his earlier testimony: "Q. . . . . Then you didn't wait until Mr. Jones, himself, came home, did you? A. I did not. Q. Yet they were his premises? A. That is correct."

in the belief that an offense was being committed and therefore the Court finds that probable cause for the search existed at the time the search was made."

Since this was so, and since ". . . a cautious man [would have been warranted] in the belief that [petitioner] was guilty of the offense of operating an illicit distillery in his home . . . ," the court deemed the search reasonable, and hence justified, despite the failure of the officers to obtain a nighttime warrant, and despite their ability, under the circumstances, to have sought such a warrant before entering the house. In so holding, the District Court relied upon *United States* v. *Rabinowitz,* 339 U. S. 56. The Court of Appeals affirmed on the basis of the findings of the district judge. 245 F. 2d 32.

Although it must be recognized that the basis of the two lower court decisions is not wholly free from ambiguity, a careful consideration of the record satisfies us that the search and seizure were considered to have been justified because the officers had probable cause to believe that petitioner's house contained contraband materials which were being utilized in the commission of a crime, and not because the search and seizure were incident to petitioner's arrest. So viewed the judgments below cannot be squared with the Fourth Amendment to the Constitution of the United States[3] and with the past decisions of this Court.

It is settled doctrine that probable cause for belief that certain articles subject to seizure are in a dwelling cannot of itself justify a search without a warrant. *Agnello* v.

---

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*United States,* 269 U. S. 20, 33; [4] *Taylor* v. *United States,* 286 U. S. 1, 6. The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy. See, *e. g., Johnson* v. *United States,* 333 U. S. 10, 14; *McDonald* v. *United States,* 335 U. S. 451, 455; cf. *Giordenello* v. *United States,* decided today, *ante,* p. 480. This purpose is realized by Rule 41 of the Federal Rules of Criminal Procedure, which implements the Fourth Amendment by requiring that an impartial magistrate determine from an affidavit showing probable cause whether information possessed by law-enforcement officers justifies the issuance of a search warrant. Were federal officers free to search without a warrant merely upon probable cause to believe that certain articles were within a home, the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified.

The facts of this case impressively bear out these observations, for it is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home that occurred in this instance. The Criminal Rules specifically deal with searches of this character by restricting nighttime warrants to situations where the affidavits upon which they are issued ". . . are *positive* that the property is . . . in the place to be searched . . . ." Rule 41 (c). (Italics added.) This Rule is hardly compatible with a principle that a search

---

[4] In *Agnello* the Court said: "Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant. Absence of any judicial approval is persuasive authority that it is unlawful. . . . Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." 269 U. S., at 33.

without a warrant can be based merely upon probable cause.

The case of *United States* v. *Rabinowitz, supra,* upon which the District Court relied, has no application here. There federal agents, without a search warrant, explored the office of the defendant and thereby obtained evidence used against him at trial. But immediately after entering the office and before their search, the agents executed a warrant they had previously obtained for the defendant's arrest. The Court stressed that the legality of the search was entirely dependent upon an initial valid arrest. 339 U. S., at 60. The exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn, and search incident to a valid arrest is among them. See, *e. g., United States* v. *Jeffers,* 342 U. S. 48, 51; *Brinegar* v. *United States,* 338 U. S. 160; *Johnson* v. *United States, supra,* at 14–15. None of these exceptions obtains in this case.

The Government, however, for the first time now maintains that the search and seizure were justifiable as incident to petitioner's lawful arrest. Its argument is: The federal agents involved in this search had authority under federal law to arrest without a warrant upon probable cause to believe that a person had committed a felony. From the record it is "rational" to infer that the federal agents entered petitioner's house with the purpose of arresting him, upon probable cause to believe that he was guilty of a felony and that he was then in the house. Consequently, the agents' entry was justified and, once in the house, while searching for petitioner, they could properly seize all contraband material in plain sight. The fact that petitioner was not found should not vitiate the legality of the seizures.

These contentions, if open to the Government here, would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a

dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment. But we do not consider this issue fairly presented by this case, for the record fails to support the theory now advanced by the Government. The testimony of the federal officers makes clear beyond dispute that their purpose in entering was to search for distilling equipment, and not to arrest petitioner. See notes 1 and 2, *supra,* p. 496.[5]

Since the evidence obtained through this unlawful search was admitted at the trial, the judgment of the Court of Appeals must be

*Reversed.*

Mr. Justice Black concurs in the result.

Mr. Justice Clark, with whom Mr. Justice Burton concurs, dissenting.

Although there are many ways to kill a cat, drowning remains the most favored. The Court applies that method to this conviction—drowning it by watering down the Findings of Fact and Conclusions of Law. By attributing to them a diluted meaning, the judgments of the District Court and the Court of Appeals are rendered insupportable.

The District Court found that the officers in this moonshine liquor case received information that petitioner, previously known to them as a liquor law violator, was operating an illicit distillery in his home. In the course of an investigation the officers (1) found "spent mash" flowing from a hose which was traced to within 75 yards

---

[5] We cannot accept the suggestion that the entry was justified since it was made to disarm petitioner's young son of the shotgun. The record plainly enough reveals that this was but a passing episode in the course of the entry, and that the officers immediately proceeded to a search of the entire house.

of the house, (2) heard a "blower burner" of the type generally used in illicit distilleries, (3) smelled the odor of hot mash coming from the house, and (4) heard the moving of heavy objects from within the house. These observations were gained over a two-day period. On the third day the officers returned with a daylight search warrant, but decided to resume surveillance instead of immediately executing the warrant. After dark, as one person left the house to walk up the road, the officers heard conversation, specifically, an inquiry as to whether "they were ready for the truck to be brought to the house." An empty truck then entered the yard and drove to the back door of the house, where a thumping sound suggesting "activity with heavy objects" was heard. The truck, heavily laden, became stuck on its attempt to leave the yard; its two occupants then were arrested, and its contents—413 gallons of nontaxpaid liquor—were seized. Thereafter, petitioner's wife and son, who had just arrived, attempted to bar the officers' entry into the house, telling them to wait until petitioner returned. The officers entered anyway, and in the course of a search, found the disputed evidence. The record reveals that petitioner was not found in the search of the premises, but was arrested when he returned later in the evening.

From these findings common sense would seem to dictate the conclusion that the officers, not believing the statement of petitioner's wife that he was not there, entered the house to find and arrest petitioner. It was his house, he was known as a prior offender, and it was he who was implicated by the tip which launched the investigation. The district judge, in fact, concluded that "the officers had reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that Roy Jones was guilty of the offense of operating an illicit distillery in his home . . . ."

The Court, however, takes these findings and conclusions to mean that both the District Court and the Court of Appeals considered the search and seizure justified "because the officers had probable cause to believe that petitioner's house contained contraband materials which were being utilized in the commission of a crime, and not because the search and seizure were incident to petitioner's arrest."

It is our duty, when the meaning of the findings is somewhat doubtful, to so construe them as to conform with and uphold the judgment. Cf. *Larkin* v. *Upton,* 144 U. S. 19, 21 (1892); *Loring* v. *Frue,* 104 U. S. 223, 224 (1881). This the Court has not done. The Court's construction is all the more surprising because it places the judgments below in direct conflict with an elementary rule of hornbook law, namely, that officers may not search a dwelling without a warrant "notwithstanding facts unquestionably showing probable cause." *Agnello* v. *United States,* 269 U. S. 20, 33 (1925). I feel certain the four learned judges on the two lower courts were well acquainted with the *Agnello* rule, and that they used the words "probable cause" as referring *not* ultimately to the search of the premises, but instead to the arrest of petitioner and any others violating the law within the house. This is borne out by the definition with which the trial judge introduced the crucial paragraph of his Conclusions of Law: "Probable cause is reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the party is guilty of the offense with which he is charged." Furthermore, the trial judge relied on *United States* v. *Rabinowitz,* 339 U. S. 56 (1950), a case where the legality of a search hinged on the legality of an arrest. The majority, noting the judge's use of *Rabinowitz,* would have us believe that the case "has no application here"; on the contrary, it would appear that the majority

has overlooked the only reason for which the case was cited.

I submit that the officers had authority to enter the house, arrest any persons engaged in the illicit operation, and, not finding petitioner, arrest him upon his return to the scene. Under the law as I have always understood it, an officer, even over protest, may enter a house to make an arrest where he has probable cause to believe that a felony is being or has been committed and that the perpetrators are in the house. *Mullaney* v. *United States*, 82 F. 2d 638; *Appell* v. *United States*, 29 F. 2d 279; *Mattus* v. *United States*, 11 F. 2d 503; 1 Wharton, Criminal Procedure (10th ed.), § 51; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 800–807. Cf. *Taylor* v. *United States*, 286 U. S. 1, 6 (1932); *Agnello* v. *United States, supra,* at 30. There being probable cause here to believe that a felon was within the house, the entry of the officers was lawful, even though after a complete search the belief was found to be incorrect. *Love* v. *United States*, 170 F. 2d 32, 33. Such a circumstance "cannot be distinguished on any reasonable basis from the search of the premises of an accused as an incident to the lawful arrest of his person . . . ." *Martin* v. *United States*, 183 F. 2d 436, 439.

Since the entry of petitioner's home was lawful, the officers had a right to seize the contraband property. The only test is the lawfulness of the officers' activity when they come upon the offending property. If the seizure follows a lawful entry to effect an arrest, as here, then it is valid. See *Harris* v. *United States*, 331 U. S. 145 (1947), seizure during lawful search incident to arrest for another crime; *Steele* v. *United States*, 267 U. S. 498 (1925), seizure during execution of warrant for different property.

I believe that these principles control here, and would, therefore, affirm.