**UNITED STATES of America,
Appellee,**

v.

**Luis Arturo GONZALEZ, Appellant.**

**No. 1056, Docket 73–1422.**

United States Court of Appeals,
Second Circuit.

Argued July 17, 1973.

Decided Aug. 9, 1973.

C. Joseph Hallinan, Jr., New York City (Diamond, Hallinan & Polacek, New York City, of counsel), for appellant.

Bancroft Littlefield, Jr., Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. for the S. D. of New York, New York City, John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellee.

Before MOORE and OAKES, Circuit Judges and GURFEIN,* District Judge.

MOORE, Circuit Judge:

Appellant, using the name Luis Arturo Gonzalez (his real name, as subsequently admitted, is Dario Jose Mejia Tobon), appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Southern District of New York. The one-count indictment charged appellant with the crime of possessing with intent to distribute 972 grams of cocaine hydrochloride (cocaine) in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(i)(A).[1]

---

* Hon. Murray I. Gurfein, United States District Judge for the Southern District of New York, sitting by designation.

1. Appellant was sentenced to a term of imprisonment of ten years.

Two errors are asserted on appeal: (1) that an allegedly illegal search and seizure without a warrant was conducted on his suitcase containing the cocaine; and (2) the trial court allegedly made improper remarks to a juror in the process of jury selection. There being no merit to either contention, we affirm.

No issue of any material fact is presented.

Appellant, on September 13, 1972, purchased a round-trip airplane ticket from Barranquilla, Colombia, to New York City. On September 17, 1972, he boarded Pan American Flight # 434 departing Barranquilla and scheduled for Kingston, Jamaica, and Miami, Florida. Upon arriving at Miami he was to transfer to Flight # 504 to New York. At Barranquilla appellant checked his suitcase to New York. At Kingston appellant transferred instead to Flight # 222 for New York, leaving his suitcase bound for Miami on Flight #434. Since Miami was the first port of entry for the suitcase, it had to be examined by Customs agents. During that examination, they discovered cocaine concealed in the soles of shoes and slippers.

On arrival in New York, appellant, seeking to retrieve his suitcase, called Pan Am to inquire about it. In the meantime, Miami Customs officials had called New York Customs officials to arrange a "controlled delivery" of the suitcase so that the cocaine smuggler might be apprehended.

Upon the arrival of the suitcase at Kennedy International Airport, Customs agents found no evidence of ownership contained therein. In order to remove the bulk of the cocaine, the Customs agents had to tear apart the shoes and slippers. A small quantity of cocaine was left inside a shoe. The torn shoes and slippers were thereupon replaced in the suitcase.

On the morning of September 19, 1972, a Pan Am representative telephoned appellant, at the number provided by the latter, advising him that his suitcase would be delivered to him at the hotel at which appellant had said he was staying. A Customs agent, posing as a Pan Am delivery man, together with another agent, took the suitcase to appellant's fifth floor hotel room, knocked, received no response, and returned to the lobby. Appellant was in the lobby. He identified the suitcase, produced his matching claim check, and signed a lost luggage receipt. Various agents then followed appellant, who went up to the fifth floor, entered his room, and closed the door. Some ten seconds later, the agents knocked on the door, appellant opened it, and the agents entered and arrested him. The suitcase was already opened and lying on the bed at the time of their entry. A search attendant to the arrest produced a key to the suitcase, a Colombian passport in the name of Luis Arturo Gonzalez (appellant's pretended name) and a part of the round-trip airplane ticket.

A subsequent chemical analysis of the cocaine showed it to be 97.5 percent pure. Prior to appellant's first trial before Judge Tenney, a motion to suppress as evidence the suitcase and its contents was denied.

■ Appellant's argument that there should have been a search warrant for the seizure of the suitcase and its contents is without any legal foundation. Inspection of luggage at ports of entry by Customs agents requires no search warrant, United States v. Ortega, 471 F.2d 1350, 1360 (2d Cir. 1972), cert. denied 411 U.S. 948, 93 S.Ct. 1924, 36 L. Ed.2d 409 (1973). The presence of the cocaine was revealed during the Customs search. For all practical purposes, the suitcase was then seized; Customs certainly would not have let the suitcase escape its custody knowing its contents.

■■ The next step in proper police procedure was for the Customs agents to try and identify the owner of the suitcase and to endeavor to ascertain what confederates, if any, he might have. Arrest in the hotel lobby would have been premature. Where was appellant taking the suitcase, to what room, and

who might be present in that room? These eventualities were still unknown to the agents. However, when the agents had identified the room which appellant had entered, and the door had been closed, they had to act immediately. As soon as the case would be opened (as it was in a few brief seconds), appellant would see the torn shoes and could easily attempt to dispose of the incriminating evidence. The seizure of the suitcase and partial search of appellant's hotel room were incident to the arrest. Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

To say that the agents should have obtained a search warrant to enter the hotel room is to ignore the realities of the situation. As already noted, no search warrant was needed in Miami, when the suitcase was actually seized. Not until appellant revealed himself and his whereabouts by telephone in New York did the agents have any clue as to the identity of the owner of the suitcase. They did not know, even when the suitcase was delivered, where appellant might go or what he would do with it. In short, there was no information they could have given, if they had applied for a warrant, which was then known to them with reasonable certainty. The scene was shifting rapidly. The agents' duty was to follow appellant and the suitcase—not to leave him for a few hours free behind closed doors to dispose of the cocaine while a warrant was being sought.[2]

■■■ As to the juror point of error raised by appellant, the jury system calls for fair and impartial jurors who are to hear both civil and criminal cases, who are to decide issues of fact and, in theory at least, who are to follow the court's instructions with respect to the applicable law. When juror number 9 questioned her own qualifications in stating that "I don't know if I can honestly send a man to jail," she was, in effect, saying that she could not meet the standards of a fair and impartial juror. Under these circumstances, she would have been disqualified not only in this case but in any other criminal case as well. The trial court's action in suggesting that her name be stricken from the jury roll was merely to avoid future repetition once her views had been so definitely expressed.

Appellant argues that since this colloquy occurred in the presence of the en-

2. A related issue was raised on oral argument, namely, whether an arrest warrant was required under the facts presented since there was ample time to obtain one after appellant had contacted Pan American in New York and prior to his arrest. A nighttime warrantless arrest in a man's home, when there is ample time to obtain a warrant, may very well be unconstitutional. United States v. Mapp, 476 F.2d 67, 73–74 (2d Cir. 1973). *See also,* Coolidge v. New Hampshire, 403 U.S. 443, 480 (Stewart, J.), 492, 91 S.Ct. 2022, 29 L.Ed.2d 564 (Harlan, J., concurring) (1971); Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). We believe, however, that the arrest here is governed by the general rule that "a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony * * *." Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). *See also,* Coolidge v. New Hampshire, *supra,* 403 U.S. at 511 n. 1, 91 S.Ct. 2022 (White, J. concurring and dissenting); Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

The Supreme Court in *Coolidge* and *Jones* was concerned with the arrest of a person in his own home and at a time (during the night) when he could expect privacy. An arrest at such a time is especially startling, upsetting, and chilling and, therefore, it must be authorized by a warrant unless it falls into one of the special judicial exceptions. *Cf.* Coolidge v. New Hampshire, *supra,* 403 U.S. at 478, 91 S.Ct. 2022. Here, however, appellant was arrested during the day in a hotel room to which he had just gone. He was in the process of committing a felony, with possession of contraband, and he easily could have disposed of that contraband. The arrest here accordingly does not fall into that category of cases discussed in *Coolidge* and *Jones* where "a warrantless nighttime entry for the purpose of arresting a person in his bed" is made. Coolidge v. New Hampshire, 403 U.S. at 480, 481, 91 S.Ct. at 2045.

tire jury panel, it tended "to terrify the remaining prospective jurors and make fair inquiry of them impossible." (Br. at 10). There is nothing in the record to suggest that the jurors ultimately selected failed to meet the jury standards and were unable to reach a fair and unbiased verdict. Nor is there any suggestion that counsel for government and defense were not satisfied with the jurors. In any event, the trial court's remarks do not constitute reversible error. *Compare* United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973) and United States v. Guglielmini, 384 F.2d 602 (2d Cir. 1967) with the facts presented here.

Judgment affirmed.