**Joseph LOWE, Jr., Petitioner,**

v.

**Joseph S. HOPPER, Warden, Respondent.**

**Civ. A. No. 3078.**

United States District Court, S. D. Georgia, Savannah Division.

March 17, 1975.

John J. Sullivan, Savannah, Ga., for petitioner.

Arthur K. Bolton, Atty. Gen., David L. G. King, Jr., Asst. Atty. Gen., Atlanta, Ga., for respondent.

## ORDER ON PETITIONER'S § 2254 APPLICATION FOLLOWING REMAND

LAWRENCE, Chief Judge.

### I. *History of Case*

This case was remanded by the Fifth Circuit for the purpose of further evidence being presented as to the "inventory exception" to warrantless searches and seizures relied on by the defendant Warden. See *Lowe v. Hopper*, 501 F.2d 952.

Joseph Lowe, Jr. was convicted in the Superior Court of Chatham County in 1971 of the crime of murder of his wife and of arson in burning down his home after killing her. Following a jury trial, he received a life sentence on the murder charge and ten years for arson. Mr. Lowe is presently an inmate at the Georgia State Prison.

On the night of the fire and before leaving the scene thereof after Mrs. Lowe's body was discovered, Sergeant (now Lieutenant) Harvey Lowery accepted custody of a plastic pouch containing various personal papers of the defendant. It had been lying on the front seat or the floorboard of Lowe's car which was parked at the burning residence. At that time he was in custody, having been arrested earlier on suspicion of arson by another officer at a point some distance from his house. Sergeant Lowery took possession of the pouch at the request of two sisters of the deceased. They called attention of the police to the items in Lowe's automobile and refused to take responsibility themselves.

After Sergeant Lowery assumed charge of the item he inspected the contents and in the course of his examination opened a sealed envelope. A letter was in it and he read the same. Petitioner contends that the officer was searching for evidence; the officer

denies that he was, stating that he opened the envelope in inventorying the materials turned over to the police by the family. The envelope which was addressed "Mrs. Law" [*sic*] and which was signed "Joe" contained the instruction "do not open until —— of Mar".

The letter turned out to be a highly incriminating murder-suicide communication written by Lowe apparently some months before. At an evidentiary hearing prior to his trial for murder and arson, the Superior Court Judge denied suppression of the letter. The ground of Lowe's motion to suppress that it was the fruit of an unconstitutional and warrantless search and seizure without defendant's permission.

In this case there have been to date: (a) a pretrial suppression hearing and a ruling thereon by the State trial Judge just referred to; (b) affirmance of the lower Court's ruling by a unanimous decision of the Supreme Court of Georgia;[1] (c) a hearing based on practically the same evidence adduced on the suppression motion before the State trial Court in connection with defendant's State proceeding for writ of habeas corpus, which was denied; (d) a third evidentiary hearing on the Fourth Amendment question held by this Court on the § 2254 petition filed by Lowe; (e) a decision by it denying same;[2] (f) an appeal to the Fifth Circuit and that Court's remand of the case[3] for purpose of a further evidentiary hearing in order to clarify the record in regard to the "inventory" exception, and (g) a fourth evidentiary hearing of the issue pursuant to the remand by the Circuit Court of Appeals.

Now, after all this, the identical search and seizure question is again before this Court for reconsideration following another evidentiary hearing and for entry of "a fresh decree".

## II. *The Decision by the Fifth Circuit in Lowe v. Hopper Examined*

Following the first § 2254 hearing before this Court, I denied the application for the writ of habeas corpus, concluding that

"[T]he conduct of the police in taking possession of the packet at the scene of the crime was not a search or seizure contemplated by the Fourth Amendment and . . . the subsequent examination of its contents at the station house[4] by way of inventory was not prohibited thereby." 367 F.Supp. at 54–55.

In the Order of this Court of November 6, 1973, it was pointed out that the United States Supreme Court has held that warrantless searches are *per se* unreasonable under the Fourth Amendment subject "only to a few specifically established and well-delineated exceptions" with the requirement that those seeking exemption from the rule must show exigency that imperated search without a judicially approved warrant. See *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564; *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576; *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514; *McDonald v. United States,* 335 U.S. 451, 456, 69 S. Ct. 191, 93 L.Ed. 153.

---

1. *Lowe v. State,* 230 Ga. 134, 195 S.E.2d 919.

2. *Lowe v. Caldwell,* D.C., 367 F.Supp. 46.

3. *Lowe v. Hopper,* 501 F.2d 952.

4. Up to the time this was written Lieutenant David W. Reiser of the County Police had not testified. I gained the impression that the inventory was made at the barracks from the testimony of Harvey J. Lowery

(see p. 39 of transcript of the § 2254 hearing). At the remand hearing Reiser testified that he told Sergeant Lowery at the scene to open the envelope to see to whom it belonged and that it took place at Lowe's burned residence. On the second hearing before me, Lowery testified that he could not truthfully say where the envelope was opened. He was sure, however, that it occurred on the evening of the fire.

Accordingly, in each such case the Fourth Amendment requires the prosecution to find some pigeonhole into which the special facts of the particular search fit. Actually, the recognized exceptions to the rule are neither few nor well-delineated. In the Order in Lowe's case, this Court mentioned ten such categories. They are not exhaustive. The eliminative process reduces these to a single possible exception in the case before us. The rule that warrantless searches are *per se* unreasonable does not apply to evidence discovered in inventorying the effects of arrestees or suspects that are properly in possession of law enforcement officers. *Harris v. United States*, 390 U.S. 234, 236, 88 S. Ct. 992, 19 L.Ed.2d 1067; *Brett v. United States*, 412 F.2d 401, 406 (5th Cir.); *United States v. Kelehar*, 470 F.2d 176, 177–178 (5th Cir.); *United States v. Gravitt*, 484 F.2d 375 (5th Cir.), cert. den. 414 U.S. 1135, 94 S.Ct. 879, 38 L. Ed.2d 761; *Chavis v. Wainwright*, 488 F.2d 1077 (5th Cir.); *United States v. Ducker*, 491 F.2d 1190 (5th Cir.).

In *Lowe v. State*, 230 Ga. 134, 195 S. E.2d 919 the Supreme Court of Georgia disposed of the case on the strength of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. "Here, as in the Coolidge case, the circumstances are clear in disclosing that the incriminating evidence came into the possession of law enforcement authorities inadvertently and unmotivated by any desire to locate incriminating evidence by any unlawful search and seizure." 230 Ga. 136, 195 S.E.2d 921.

This Court in its 1973 decision found that no meritorious claim of unlawful search or seizure existed up to the time the packet arrived at the police barracks, that is, up to the point the envelope was opened. The Supreme Court of Georgia did not deal with the inventory issue other than noting that the items taken and "inventoried were in plain view in the automobile on the floorboard". The Circuit Court said that

"this does not constitute a finding that the inventory was in compliance with the Fourth Amendment" (501 F.2d 953, n. 2). It went on to say:

"The Georgia Supreme Court did not, however, address the aspect of whether, once the officer had possession of the letter, he violated the Fourth Amendment by extracting it from among the papers turned over to him for safekeeping, opening it, reading it, and thereby discovering its incriminating nature."

This Court held that there was evidence

"justifying the finding that Sergeant Lowery in examining the contents of the pouch was making an inventory rather than a search and that he was not looking for incriminating evidence against the accused. Inventorying an arrestee's belongings is a reasonable procedure for the protection of his property and for that of the police." 367 F.Supp. 53.

The Court of Appeals agreed that an officer taking custody of items for safekeeping would be entitled to take steps to protect himself against a later claim that a sum of money had been in the papers and was missing. 501 F.2d 953. However, the higher Court found that the evidence as to the inventory fell short of the fullness required "before a correct determination can be made of whether the Fourth Amendment was violated". It said that relevant to the matter of whether the officer was making an inventory of the effects as opposed to conducting a warrantless search were:

". . . the length of time since the property came into his possession, whether he had left the items unprotected during that time, whether other means were available to protect himself, whether a record was made of the contents of the bag, etc. We do not know whether the letter was sealed or unsealed, whether there was a police policy of making an invento-

ry, and whether any record was made of the items inventoried." At 953–954.

I deal below with these questions in the light of the testimony at the evidentiary hearing following remand.

### III. The Evidence as to Inventory of the Effects

(a) The time of taking an inventory in relation to when the items came into possession of the police.

The County Police were notified of the fire at 3:11 P.M. and Officer Franklin answered the call. Sergeants Lowery and Reiser reached the scene about 4:00 P.M. At approximately 4:50 P.M. Lowe was arrested several miles from the burning residence on suspicion of arson.

By 6:15 P.M. the fire had been extinguished sufficiently for a body to be recognized in the kitchen. By nine o'clock the fire had cooled enough for the charred corpse to be removed and identified. Mrs. Lowe had been shot. At that time the police had completed their work except for the securing of Lowe's automobile. Sergeant Lowery testified at the first § 2254 hearing that he requested members of the family to take charge of the vehicle. His purpose was to prevent anyone from damaging or stealing the vehicle "as they normally do when a house is destroyed and things are left laying around".

Sergeant Lowery further testified that the relatives went to the automobile and came back to him, reporting that there were some papers in it for which they did not wish to be responsible. They requested him to assume responsibility. The papers were removed from the car and custody was taken by Lowery. Tr. first § 2254 hearing, 33. According to Reiser, this occurred around 9 P.M.

Lowery is uncertain whether the letter was read by him before he left the scene of the crime or after his return to police headquarters. He got there about 10 P.M. It is a 20 to 25 minute drive from the scene of the fire.[5]

Lowery remembers that Reiser was present when the pouch and envelope were opened. Tr. first § 2254 hearing, 27. On the back of the envelope appears the notation by Sergeant Lowery: "9:17 P.M., 4/13/71 Removed from black, plastic pouch on front seat of 1965 Chrysler Tag # REC 649 GA 71." Lieutenant Reiser testified that Lowery examined the papers between 9 and 9:30 P.M. at the scene of the fire. "I believe I told Lowery to go ahead and open it and see who it belonged to. That's when we discovered the contents of the letter. We kept it for evidence after we discovered what it was." The purpose of examination was to determine whether any money was included in the effects. According to Lieutenant Reiser, after the envelope was opened and Lowery had read the letter, it was handed to him to read.

I conclude from the evidence that the pouch came into possession of the police sometime between 9 P.M. and 9:15 P.M. Shortly thereafter and at the scene of the crime the pouch and envelope were opened and the incriminating letter discovered by Sergeant Lowery.

(b) Whether the police officers left the items unprotected after taking possession thereof.

Lowery and Reiser were asked to take possession of the materials shortly before they left the scene of the fire. The items in question lay unprotected in the car up to the time Sergeant Lowery became custodian of same. He kept custody that night until he locked them in a metal cabinet at headquarters in which

5. On cross-examination of Lieutenant Lowery at the remand hearing, he was asked whether he had told Lowe's attorney the day before that he read the letter five or six hours "later" and that he had gotten possession of it at 9:30 or 10 P.M. Lowery said that he could not recall where he read it but that "it could have been" five or six hours "later". This would have been around 2:30 or 3 A.M. Lieutenant Reiser definitely fixes the place of the reading at the scene and the time between 9 to 9:30 P.M. on the night of the fire.

evidence is preserved. The papers remained in possession of the police until taken to court for use as evidence in the State trial.

(c) *Whether the envelope was sealed.*

Lieutenant Reiser testified that to the best of his knowledge the envelope containing the letter was sealed. Lieutenant Lowery also testified that it was sealed.

(d) *Whether other means were available to the officer to protect himself from any claim that items of value were subsequently missing.*

Lowery and Reiser obtained custody of the materials because the family refused to be responsible for same. Lieutenant Reiser testified that it is police practice to attempt to find a family member who will assume responsibility for any property left at the scene of a fire but if they refuse, the officer must take control.

Counsel for Lowe suggested at the first § 2254 hearing in this Court that, in the absence of a search warrant, if the officer desired protection against any possible claim as to loss of valuables, he could have obtained same by placing his signature on the pouch (or envelope) and have the relatives do likewise. It was further suggested that someone at headquarters could have signed the envelope denoting that it was sealed. At the hearing on remand, Lieutenant Lowery admitted that a member of the family could have initialed the envelope rather than opening it and looking at the letter. He may, indeed, have handled the matter that way. But I am not aware of any constitutional requirement as to the exact way in which officers may properly protect themselves in such cases. Informality is not unconstitutionality.

The action of the officers ought to be evaluated in the ambience of the situation and not by the unexpected windfall of their routine examination of the contents of the pouch. At the hearing on remand Lowery and Reiser testified that they were not looking for evidence when they took possession of Lowe's effects. There was no reason for either officer to suppose or suspect that an incriminating letter was among them. Lieutenant Reiser testified that earlier on the evening in question he had "glanced" into the car, "looking for anything". There was a report that shots were heard before the fire was noticed and apparently he was looking for a weapon. He did not take the papers out of the car at that time. The police were not interested until relatives of Lowe's wife refused to take responsibility. "They had found some papers and a money bag they said they didn't want to be responsible for and turned them over to us." Tr., First suppression hearing, 7.

In the decision in this case the Court of Appeals pointed out that the investigating officer (Lowery) said that he was looking for clues relative to possible arson and that he testified that he opened the envelope "to see what was in it".[6] This statement is not inconsistent with the testimony that it was for inventory rather than evidentiary purposes.

I find that the motivating factor of the so-called inventory was to protect the officers in assuming care of the effects.

(e) *Whether any record was made of the inventory of the contents of the pouch.*

In the decision of the Fifth Circuit in Lowe's case it is stated (501 F.2d 953): "The only reference at trial to the inventory question had been an affirma-

---

6. "Q. So, then, what did you expect to find by doing that?
A. I didn't know.
Q. But, you thought possibly you could find some fruits of some crime, didn't you?
A. I didn't know at that time.

Q. But, you felt maybe you could, isn't that true?
A. I didn't know.
Q. Well, why did you open it then?
A. To see what was in it." Tr., first § 2254 hearing, 28.

tive answer by the officer to a single question of whether he made an inventory of the papers turned over to him."[7]

When an arrestee is brought to the Chatham County jail, valuables found on his person are taken by the jailer, inventoried, and a receipt given to the prisoner. However, in cases such as the present there is no governing regulation or, as Lowery testified at the remand hearing, the Department has "no specific instructions as to inventory". No particular form or procedure is required as to formal listing of such items coming into police custody.

No formal list was made at any time of the contents of the pouch. When the officers used the term "inventory", the term was meant, I think, in a loose rather than the technical sense of a written list or catalogue. Here the "inventory" consisted of an inspection of the contents of the pouch to ascertain if anything valuable was among the items and the making of a mental note of the papers therein.[8]

(f) *Whether there was a police policy of making an inventory.*

This phase of the case has been dealt with in (e), *supra*.

## IV. *Conclusions*

In applying the inventory exception to a search or seizure a district court must heed the flashing red light warnings of *United States v. Grill*, 484 F.2d 990, 991–2. There the Fifth Circuit said:

"The so-called 'inventory searches' can, of course, be employed as subterfuges and can be the subject of abuse. It is temptingly simplistic to employ the phrase 'inventory' as though uttering it solves everything, and all too easy to state overbroadly the interests which 'inventory searches' vindicate, and to automatically give to those interests a primacy which, in the balance between public and private interest, they do not necessarily enjoy."

"Having said that," added the Court of Appeals, "we conclude that in this case there is no evidence of overreaching done in the name of inventory which would cause us to doubt the result we reach."

I find difficulty in distinguishing the present case from *Chavis v. Wainwright*, 488 F.2d 1077 (5th Cir.). There the police in the course of investigating a serious stabbing took custody of the victim's bloody clothing for evidentiary purposes. At the hospital an inventory of the contents was made. A packet of heroin was discovered. Subsequently, the victim was prosecuted and convicted on the State level for possession of a narcotic drug. On writ of habeas corpus the defendant contended that the search was illegal. The Fifth Circuit said:

"We agree with the district court that Officer Chamberlain did not find the heroin as a result of a search for evidence against Chavis. He inadvertently found the heroin as a result of an inventory of the clothing that he was duty bound to keep as evidence of a crime. Personal effects in the clothing required protection for the benefit of Chavis. Officer Chamberlain could not send the clothing off in the custody of others without knowing what was to be returned. The only reasonable method for such safekeep-

---

7. "Q. All right, and what articles did you take out of the automobile?
A. The money bag containing some insurance papers, checkbooks and personal papers belonging to the family.
Q. What type of personal papers?
A. Different assorted things, checkbooks, deposit slips, insurance papers and a letter.
Q. All right, sir, and this was all contained in one package?
A. It was.
Q. Did you make an inventory of this package?
A. We did." Testimony of Lowery, Tr. 25.

8. They consisted of checkbooks, deposit slips, insurance papers and the sealed envelope containing the murder-suicide letter. See testimony of Lowery at the suppression hearing in the trial court.

ing was to inventory the contents. That was plainly the real purpose of the inventory undertaken here. Finding the heroin was simply an unanticipated result. See, *United States v. Pennington,* 5 Cir. 1971, 441 F.2d 249; *United States v. Lipscomb,* 5 Cir. 1970, 435 F.2d 795."

■ This is a close and difficult case. To begin with, there must be a showing by those who seek exemption from the constitutional mandate of an exigent situation. The burden is on the government to show that the search is within one of the exceptions to the warrant requirements of the Fourth Amendment. *McDonald v. United States, supra,* 335 U.S. 456, 69 S.Ct. 191; *United States v. Edwards,* 474 F.2d 1206, 1212 (6th Cir.); *United States v. Cristancho-Puerto,* 475 F.2d 1025, 1027 (5th Cir.). The constitutional problem is magnified by the existence of possible alternative courses by which the police may have laid to rest any Fourth Amendment claim arising out of inspection of the papers. Adding to the difficulty, there is lack of any uniform rules or procedures as to inventorying. According to Lieutenant Resier, the Department used a "common sense" approach. Finally (let's face it) the longer a defendant's sentence, the more squeamish federal scrutiny of the constitutionality of the search and seizure is apt to be. And Lowe is serving a life sentence.

Was there a warrantless "search and seizure" of the incriminating letter? Or was there an innocent, unexpected discovery of evidence during the process of a protective inspection or "inventory"

of effects in legitimate custody of law enforcement officers?[9] In *Mozetti v. Superior Court of Sacramento County,* 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84, 88, the Supreme Court of California said: "Merely because the police are not searching with the express purpose of finding evidence of crime, they are not exempt from the requirements of reasonableness set down in the Fourth Amendment." However, the Fifth Circuit decisions indicate that the test is a more subjective one. The "real purpose" of the inspection must be inventorial and nonpretextuous with an unexpected result insofar as turning up evidence is concerned.

■ I am not persuaded that the Fourth Amendment means that an inventory inspection of papers properly in police possession must be in accord with strict procedures established by police regulations as to time, place and method. If an inventory is made immediately after an officer obtains possession of effects, any subsequent claim that valuables are missing would be the more difficult to show.

■ While there are some inconsistencies in the testimony and while there is vagueness on Lowery's part as to the place where he opened the envelope, I am satisfied that his inspection of the contents was not a pretext for a prohibited search.[10] Custody of the pouch was not obtained by seizure. Possession of the papers was neither sought nor demanded. The family would not accept responsibility. The officers took them to headquarters. Reiser had casually noticed the papers in the car. He ap-

---

9. In this Court's first Order (367 F.Supp. 53, n. 11) I suggested that it could be argued that the moment the officer sensed that the letter in the envelope might be incriminating, he should have stopped reading it and obtained a search warrant. But might not such a warrant be fatally defective because of contamination of the source of the information on which it was based? See 79 C.J.S. Searches and Seizures § 74, p. 871.

10. In my first Order I called attention to the State trial Judge's reaction to the evidence at the suppression hearing before the trial. "It just seems to me that the only purpose in the world of getting into the car and getting the papers was the purpose of using them as evidence if they amounted to evidence." Tr. 13. However, as was pointed out, it is implicit in the trial Court's denial of the motion that he accepted the State's version in the last analysis. See 367 F. Supp. 48, 54, n. 15.

parently gave no further thought to them until some time after 9 P.M. when the relatives of the victim called the attention of the officers to the items on the floorboard of the automobile and refused responsibility. There was no reason to think that incriminating evidence would be developed from these effects. The police inspection was routine with the purpose of protection against a conceivable claim that valuables were missing.

I find that when the contents of the pouch were examined, the officers were not searching for evidence of guilt but to safekeep the items and to safeguard the police. As in *Chavis v. Wainwright, supra,* 488 F.2d 1078, "the inventory was made precisely for the purpose of safekeeping".

Accordingly, petitioner's application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 is again denied.