## STATE OF FLORIDA v. GITEGA

Case No. 83-10468 CF A

Seventeenth Judicial Circuit, Broward County

June 12, 1984

### APPEARANCES OF COUNSEL

**Richard McCully,** Assistant State Attorney, for plaintiff.
**Richard Rendina** for defendant.

### OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

Eduardo Gitega is now before the Court upon a charge of trafficking in cocaine and possession of a firearm during the commission of a felony. Defense counsel has filed a Motion to Suppress seeking a ruling from the Court that would prohibit the State, in its prosecution of this cause, from utilizing the firearm and cocaine removed from the luggage of the defendant. The Court has heard the testimony of the accused and of Annette Barone. By stipulation of the attorneys, the Court has also read the deposition of Sgt. Michael Ahern of the City of Miami

Police Department and the sworn *ex parte* statement of Mary Pappas. Both attorneys have afforded the Court the benefit of their legal research and have made oral argument in this cause. Based upon all of the foregoing, the Court has reached the conclusion set forth below.

## ACT I

### SCENE I

Michael Ahern, a Sergeant with the City of Miami Police Department, received information on October 7, 1983, from a confidential informant, that a man meeting a certain physical description would arrive at the Greyhound Bus Station in Hollywood for the purpose of boarding a bus, the destination of which would be New York City. The described individual, according to the informant, would travel to the Hollywood Greyhound Bus Station in a cab he would hire in Miami and would have a physical description of 5'8", 160 to 170 pounds, Afro hair style, light complexion and carrying a tote bag that would contain about one pound of cocaine. The suspect would arrive at the Hollywood Greyhound Station about 10:00 P.M. on October 7, 1983.

Sgt. Ahern telephoned the Hollywood Police Department for the purpose of passing the above described information on to that Department for its use. Being unable to make contact with anyone he knew in the Hollywood Police Department, Sgt. Ahern requested that he be connected with the Vice, Intelligence and Narcotics Squad of the Detective Division. Quite by chance, Sgt. Ahern spoke with Detective Louis Wagoner, at approximately 8:00 P.M., to whom he imparted the information received from the confidential informant. In addition to the information above described, Angel DelHierro was also furnished as being the name of the target. No efforts were taken by Detective Wagoner to confirm that the party with whom he had the telephone conversation was, indeed, Sgt. Ahern.

### SCENE II

Detective Wagoner, accompanied by Detectives Brilliant and Heath and Sgt. Stanley (all of the Hollywood Police Department), took up surveillance positions at the Hollywood Greyhound Bus Terminal. At approximately 10:30 P.M. the defendant arrived in a taxi cab marked so as to clearly identify it as one emanating from Miami. Carrying a tote bag, the defendant walked into the bus station and conversed briefly with the ticket agent, ordering his ticket to New York for which he paid with a $100.00 bill. While the ticket agent was arranging defendant's passage, he returned to the taxi for the purpose of retrieving two more pieces of luggage. It was while he was returning to the

45

ticket area with his luggage that Defendant was confronted by the police.

According to the law enforcement officers, they identified themselves to the accused, told him of the information that they had received from Miami and asked for the accused to produce some type of identification. As the defendant produced his Florida driver's license, he appeared nervous and jittery. Upon examining the driver's license, the detectives told the accused that they wished to examine his luggage if he would give permission to do so. To this officer's request, the defendant allegedly responded with affirmative permission for the search to occur. In the tote bag there was discovered a firearm and a quantity of cocaine. Upon seeing what had been discovered within his possession, the Defendant allegedly blurted out that the cocaine was not his; that he was just "carrying it".

When the luggage of the defendant was further examined at the Hollywood Police Department, there was discovered therein small quantities of marijuana and cocaine as well as eleven diazepam pills. The package of cocaine found upon the initial stop and search weighed in excess of 400 grams. The cocaine was wrapped in a package securely sealed with duct tape and concealed with a towel. The side of the package had a small "L" shaped incision in it which, when peeled back, revealed a white powdery substance later identified as cocaine.

## SCENE III

In contrast to the testimony offered by the law enforcement officers, Defendant has offered that of Annette Barone, Mary Pappas and himself. As is not surprising, there are significant conflicts in the testimony.

Ms. Pappas and Ms. Barone established that they were the ticket agents on duty at the Greyhound Bus Station in Hollywood when the accused came on the scene on October 7, 1984. Ms. Pappas was the agent from whom the ticket was ordered and to whom the accused delivered a $100.00 bill to cover the cost thereof. She observed that the defendant left the interior of the bus station while she was preparing his ticket; when he returned, he was followed inside by the police officers. One of the officers gained the defendant's attention by placing a hand upon the defendant's shoulder and, when he turned around, showed to the defendant a badge.

It was Ms. Barone's testimony, as contained in her *ex parte* sworn statement given to defense counsel, that she did not hear the defendant say anything to the police other than, "That's my luggage". Ms.

Pappas had no recollection of the defendant giving anyone permission to search his luggage. The examination of the defendant's luggage was conducted on the floor just in front of the ticket counter, right after the defendant had identified it as his.

Ms. Pappas advised the Court that she was assisting Ms. Barone by taking care of the defendant's luggage that had been left at the ticket counter while he went to claim the rest of his luggage from the taxicab. While the defendant was outside the terminal building, a police officer displayed his badge to Ms. Barone and advised that the subject was about to be arrested. When the defendant returned to the interior of the ticket terminal, he was followed by the police. The defendant's luggage was placed upon the floor and opened by the police while the defendant stood nearby with his hands behind his back. At no time was the defendant asked, in her presence, for permission to search the luggage. Although the ticket counter blocked her vision so that she could not actually see the search of the defendant's luggage, Ms. Barone was able to hear all that was transpiring.

The testimony of the defendant, not surprisingly, was at odds with that offered by the police officers, but somewhat supported by the testimony of Ms. Pappas and Ms. Barone.

According to the defendant, he arrived, by taxicab, from Miami, at the Hollywood Greyhound Bus Terminal about 10:30 P.M. With him he carried two pieces of luggage and a clutch bag. Defendant went inside the terminal to order his ticket and to get some change with which to pay the taxi fare. Carrying a metal food container in his hands, defendant approached the ticket counter where two women (apparently Ms. Pappas and Ms. Barone) were located. He was advised by one of the women that the bus to New York was outside and waiting, thereby necessitating the need for him to hurry if he wanted to catch it.

When he first entered the ticket terminal, Defendant had seen a man later identified as one of the police officers. As defendant returned to the ticket terminal with two of the three pieces of luggage he had recovered from the taxicab driver, he was intercepted by one of the officers who displayed a badge, took defendant by the arm, and turned him around. The police immediately informed defendant that he was trafficking in cocaine and that they wanted to see his identification. The driver's license shown to the police by the defendant bore the name Eduardo Gitega.

When requested to, inside the ticket terminal, defendant identified for the officers the luggage that was his. One of the officers placed one

**47**

piece of defendant's luggage in the vicinity of the ticket counter and, without asking permission to do so, began to search its contents. Defendant was removed to another part of the ticket terminal in the custody of the officers where he was held until one of the searching officers gave notice of the discovery of the firearm and the package of cocaine. After the discovery of the contraband, the magic words commonly associated with the act of arrest were uttered to the defendant.

Defendant denies that he was ever informed that he could refuse or otherwise prevent the search of his luggage.

At the time of his arrest, testified the defendant, he was 6 feet one and one-half inches tall in his boots, had short hair on the top and sides of his head with slightly longer hair in the back, his hair was dark (not red), his hair was straight due to the use of an anti-wave lotion and was not cut in any semblance of an "Afro". The Court has observed that the defendant's skin tone is of a light complexion.

Defendant vigorously denies making the statement attributed to him in reference to the cocaine in the package not being his. Defendant also strongly denied the allegation that he consented to the search of his luggage.

## ACT II

## ANALYSIS OF RELEVANT LAW

### SCENE I

The questions that must be resolved by the Court, and the order in which they must be approached are:

1. When the detectives from the Hollywood Police Department first made contact with the defendant, were they possessed of legally sufficient grounds to effect the arrest of him?

2. Assuming that the answer to question number 1 is in the negative, was the initial confrontation of Mr. Gitega by the Hollywood police legally justifiable under F.S. 901.151, Florida's "Stop and Frisk" law?

3. Assuming the answers to questions number 1 and 2 are in the negative, is the evidence before the Court sufficient to conclude that Mr. Gitega freely and voluntarily permitted the search of his tote bag wherein the firearm and the cocaine were found?

### SCENE II

The colonial settlers of this country, keenly alert to arbitrary

48

invasions upon one's privacy in the name of the sovereign, insisted upon the adoption of ten amendments to the basic constitutional document offered them by their chosen representatives before they would agree to be bound thereby. The overt expression of the anathema of the new nation against intrusive acts designed to ferret out evidence of wrongful conduct is embodied in the Fourth Amendment to this nation's seminal document. In turn, the State of Florida, by the adoption of Article I, Section 12 of the Florida Constitution, has reaffirmed its adherence to the principle that the individual is the important cog in the machinery of government. It is because all power not expressly given over to government remains with the people that warrantless searches are presumptively invalid. The burden rests upon the party seeking to utilize the evidence obtained as a result of a warrantless search to establish that such search was permitted by some exception to the basic premise described above. *United States v. Jeffers*, 342 US 48 (1951).

In the matter now before the Court, the State asserts that no warrant was needed for the search of Mr. Gitega because the police, at the time of the search, were possessed of sufficient probable cause to effect the arrest of the accused and, therefore, the search was "incident to a lawful arrest", a recognized exception to the warrant requirement. The authority for the position of the State is reviewed in *Rawlings v. Kentucky*, 448 US 98 (1980), wherein it was held that if probable cause to arrest the accused in fact exists *without the fruits of the search then being reviewed, and* if the actual arrest follows quickly upon the heels of the search about which complaint is made, it matters not which came first—the search or the actual arrest.

"Probable cause", as that term is used in the law relating to the Fourth Amendment of the United States Constitution and Article I, Section 12 of the Florida Constitution, requires not that the law enforcement officer know beyond a reasonable doubt that the article sought to be discovered is within the protected area sought to be searched; rather, the fundamental issue to be determined is whether it is reasonable that he held such belief based upon the information at the law enforcement officer's disposal upon the occasion of the search about which complaint is made during the criminal prosecution proceedings. *State v. Malone*, 288 So.2d 549 (Fla. 1st DCA 1974). Our courts are to utilize "common sense" when evaluating whether the facts offered in an application for a search warrant are sufficient when determining the existence of probable cause. *Illinois v. Gates*, 100 S.Ct. 2317 (1983). So long as a reasonable interpretation of the facts alleged in an application for a search warrant results in a reasonable inference

that the contraband sought to be recovered is located within a particular place the search of which is desired, it is not necessary to tie such contraband to such place of concealment by direct evidence. *State v. Powers*, 388 So.2d 1050 (Fla. 4th DCA 1980); *Younger v. State*, 433 So.2d 636 (Fla. 5th DCA 1983).

When the Hollywood detectives stopped Mr. Gitega, they had already confirmed that his person matched, in almost all respects, the description given by the confidential informant as passed on to them by Detective Ahern of the Miami Police Department. Admittedly, there was some variance as to the height of the suspect and the shape of his hair, but such differences are perceived by this Court not to be of major significance when viewed from the perspective of *Illinois v. Gates*, supra.

Mr. Gitega, by his actions, further underscored the accuracy of the confidential informant's tip when (1) he arrived at the Hollywood Greyhound Terminal in a taxi marked dramatically to establish the fact that it was from Miami, (2) he purchased a ticket from Hollywood to New York, and (3) he carried with him a tote bag.

Notwithstanding the information then in their possession, as described above, were the Hollywood police then in a legal posture to effect the arrest of Mr. Gitega? This Court thinks not; all that the Hollywood Police then had at their disposal was a founded suspicion that Mr. Gitega was carrying contraband in his tote bag. Suspicion will not rise to the level of probable cause, not even as that term has been herein defined.

Based upon the foregoing analysis, the Court is constrained to answer question number one in the negative.

## SCENE III

In 1968 the United States Supreme Court, in *Terry v. Ohio*, 392 US 1, rendered a decision that led, ultimately, to the adoption in Florida of F.S. 901.151. *Terry v. Ohio*, supra, and F.S. 901.151, provide that a law enforcement officer is justified in stopping a person and "frisking" the body of such person for certain narrowly defined reasons. The condition precedent to the right to conduct such cursory body search is the requirement that the searching officer be possessed of a "founded suspicion" that the person searched has committed, is committing or is about to commit a crime. The purpose to be served by F.S. 901.151 is to afford the law enforcement officer the opportunity to ascertain the identity of the person stopped and the circumstances surrounding the person's presence abroad which led the officer to believe that the

person stopped had committed, was committing or was about to commit a crime. If, at any time after the onset of the temporary detention, there arises probable cause to arrest the detained party, such person shall be arrested and proceeded against according to law.

"Founded suspicion", as that term is used in *Terry v. Ohio*, supra, and F.S. 901.151, is:

". . . a suspicion which has some factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge . . ." *State v. Stevens*, 354 So.2d 1244, 1247 (Fla. 4th DCA 1978).

"Temporary detention" is defined to mean a detention for a period of time no greater than is reasonably necessary to investigate the situation and to establish whether there is probable cause to arrest the detained person. See *State v. Stevens*, supra, where a detention of less than thirty minutes was approved.

Whatever else they may have wanted to do, the only recourse available to the Hollywood Police upon their initial detention of Mr. Gitega was a cursory search of the tote bag in his possession. Had that brief search been unproductive, the Court is of the opinion that any further examination of Mr. Gitega's luggage would, more likely than not, been constitutionally infirm. Given the discovery of the firearm within the confines of the tote bag almost immediately upon the commencement of their search, the Hollywood police were promptly possessed of probable cause to arrest Mr. Gitega. As pointed out previously in this order, when possessed of probable cause to effect an arrest and the arrest follows quickly upon the heels of the complained of search, it matters not that the formal arrest follows the complained of search.

Because Mr. Gitega was arrested promptly upon the discovery of the firearm, and since the discovery of the firearm was occasioned pursuant to the legally sanctioned temporary detention of Mr. Gitega under F.S. 901.151 and *Terry v. Ohio*, supra, the Court herewith determines that question number two must be answered in the affirmative.

## SCENE IV

Solely to avoid future judicial labor, the Court deems it advisable to resolve the third question propounded above, i.e., the question of Mr. Gitega's alleged consent to the luggage search.

The resolution of factual disputes between law enforcement officers and accused parties is never a simple task. To facilitate a decision that most accurately reflects the truth of a given situation, resort must be

had to that information received from those witnesses that can be classified as the most neutral. Because of the very nature of people, it is reasonable to conclude that those who are most intimately involved in a situation are less likely to have an objective recollection of events than those who genuinely have nothing to gain by the outcome of a dispute. It is for this reason, therefore, that the Court has placed much reliance upon the testimony of Ms. Barone and Ms. Pappas, the Greyhound Bus Ticket Agents.

As is summarized in the beginning of this Order, Ms. Barone and Ms. Pappas were both behind the ticket counter of the bus terminal when Mr. Gitega entered and ordered his ticket for passage to New York. The ladies were still behind the ticket counter when Mr. Gitega reentered the terminal escorted by the Hollywood detectives. Neither of the ladies heard any police officer request permission of Mr. Gitega prior to commencing the search of his luggage. Because the luggage examination occurred in close proximity to the ticket counter, and because Mr. Gitega was also kept in close proximity thereto, the ladies were uniquely situated to observe that which was about to transpire.

As was said in *Katz v. United States*, 389 U.S. 347 (1967), warrantless searches are *per se* unreasonable under the Fourth Amendment, with only a few specifically established exceptions, well delineated in the law. The exceptions to the warrant requirement of the Fourth Amendment (and, concomitantly, Article I, Section 12 of the Florida Constitution) are ". . . jealously and carefully drawn". *Jones v. United States*, 357 U.S. 493 (1958). When the State seeks to rely upon the existence of one of the recognized exceptions to justify the failure to procure a search warrant, the burden of proof is solely upon the State. *United States v. Jeffers*, 342 U.S. 48 (1951); *Andress v. State*, 351 So.2d 350 (Fla. 4th DCA 1975); *Bumper v. North Carolina*, 391 U.S. 543, (1968).

One of the recognized exceptions to the warrant requirement is consent given by the accused to the searching party. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). To establish that the consent relied upon was freely and voluntarily given, as required by *Bumper*, supra, the State must establish the necessary elements by clear and convincing evidence. *Norman v. State*, 379 So.2d 643 (Fla. 1980); *Restrepo v. State*, 438 So.2d 76 (Fla. 3rd DCA 1983). Voluntariness must be determined by an examination of the totality of circumstances existing at the time such consent was allegedly given. *Rosell v. State*, 433 So.2d 1260 (Fla. 1st DCA 1983); *Restrepo v. State*, supra.

Applying the principles of law set forth above to the matter at hand,

52

the Court is not able to say that it is convinced that there exists a sufficient quantum of proof necessary to establish that Mr. Gitega gave a free and voluntary consent, if he gave any consent at all, to the search of his luggage by the Hollywood police. Finding that he gave no valid consent to the search of his luggage, the Court is thus required to exclude from its consideration whether Mr. Gitega made the statement that the cocaine found in his tote bag was not his, the primary illegality of the search not having been eliminated.

## ACT III

### SCENE I

Summarization of the facts and law discussed above is most succinctly achieved by restating the questions posed at the outset of this Order on Motion to Suppress, viz.:

1) When the detectives from the Hollywood Police Department first made contact with the defendant, were they possessed of legally sufficient grounds to effect the arrest of him?

ANSWER: NO

2) Assuming that the answer to question number one is in the negative, was the initial confrontation of Mr. Gitega by the Hollywood police legally justifiable under F.S. 901.151, Florida's "Stop and Frisk" law?

ANSWER: YES

3) Assuming the answers to questions number one and two are in the negative, is the evidence before the Court sufficient to conclude that Mr. Gitega freely and voluntarily permitted. the search of his tote bag wherein the firearm and cocaine were found?

ANSWER: NO

### SCENE II

### CONCLUSION

The foregoing considered, the Motion to Suppress filed herein by the Defendant, EDUARDO GITEGA, is hereby DENIED.